Margie F. GRIMES, Appellant,

v.

GOODLETT AND ADAMS et al., Appellees.

Court of Appeals of Kentucky.

Feb. 17, 1961.

Rehearing Denied April 28, 1961.

W. H. Phillips, F. D. Curry, Harrodsburg, for appellant.

C. W. Swinford, Lexington, for appellees.

PALMORE, Judge.

Chester Grimes died of a heart attack suffered at work. Overruling an order of the referee making an award, the Workmen's Compensation Board dismissed the compensation claim of the decedent's widow and children. This appeal is from a judgment of the circuit court affirming that action.

Grimes was 49 years old and had been employed by the appellee company for 3½ years prior to his fatal attack and death on December 31, 1956. He was used as an "all-purpose" man in general construction work, and on the day in question had reported as usual and worked for 2 hours operating an air hammer or "jackhammer" in breaking up and removing the asphalt, concrete and underlying soil of a street preparatory to the installation of gas meters. He was in apparently perfect health, with no known previous manifestations of a coronary ailment. Having completed his work on the first hole dug that morning he laid the jackhammer down, stepped out of the hole and went to a truck, where he sat down in the seat. Within minutes thereafter fellow workers saw his head fall back and found him in great distress from pains across the chest. He had made no previous complaint, though one witness noticed that he was breathing heavily as he made his way to the truck. He was rushed to a hospital where he died within 30 to 40 minutes. The attending physician certified the immediate cause of death as coronary thrombosis or occlusion, with coronary arteriosclerosis as a secondary cause. There was no autopsy.

Testifying in answer to the question of what relationship, if any, the work in which Grimes had been engaged immediately before the attack bore to the fatal occlusion, the attending physician said, "I don't know." He admitted, however, that violent exercise is bad for a person suffering from a heart condition and that the work "could have" contributed to the attack. He was of the opinion that Grimes had a pre-existing coronary disease of which the decedent was not aware.

Three other physicians testified, all on the basis of hypothetical questions. Dr. Kenneth L. Sears, of Lexington, said that "the use of a violent and heavy tool, weapon, or such would be a contributory cause. * * but clearly a contributory cause, not a primary cause," and that the strenuous work "precipitated and contributed" to the

death, with the "arteriosclerotic heart disease as the underlying cause." He explained that arteriosclerosis is a progressive disease that develops over a period of many years, and although perhaps 50% of the deaths resulting therefrom occur without any violent activity, when the condition has developed to the point of being a menace to life additional stress precipitates the fatal result. Otherwise, he said, "I think very likely he would have gone on living until it spontaneously occurred. That thing didn't cause it, that precipitated it." The professional conclusion elicited from this witness is epitomized in the following excerpt from his testimony: "I feel there's a direct contribution between his violent activity or work and his sudden coronary."

Dr. John Harvey, of Lexington, was even more positive, as exhibited by the following portions of his testimony: " * * in my opinion the type of work Mr. Grimes was doing at the time could reasonably be a precipitating if not a major factor in his death, *and I believe that it was * * * what he was doing at the time he was taken ill was a major factor in the cause of his death.*" (Emphasis added.) Asked what he would have given as the cause of death had he signed the death certificate, he replied, "Cause unknown, probably precipitated by his tremendous activity with the air hammer."

Dr. Thomas G. Hobbs, also of Lexington, and a highly qualified cardiovascular specialist, testified on defense. He pointed out that coronary thrombosis occurs more often during inactivity than during strenuous activity and that physical exertion is not "necessarily" a precipitating cause. Work alone would not cause it. In the absence of a post mortem, Dr. Hobbs said, "it is impossible for me to state that this person definitely had a disease commonly known as coronary thrombosis," and "I think it is impossible to state definitely what caused Mr. Grimes' death * * * because of lack of findings both clinical and pathological; the latter, I am referring to a post-mortem ex-

amination." As to the existence of a relationship between the work and the death, he concluded that "I don't think it is wise to try to say that there is or is not a relationship. Inasmuch as the information is not conclusive, one cannot make a definite statement to that effect."

Observe here that Dr. Hobbs was careful not to venture an opinion as to the *probable* cause of death, nor did he say that the known facts were insufficient to indicate a reasonable probability. In the absence of *certainty* he would give no opinion whatever. But the law does not demand certainty of cause (even in a murder case— see White v. Com., Ky.1960, 333 S.W.2d 521, and cases therein cited). The facts or hypotheses on which the professional witness testifies need not be conclusive. They are sufficient if in his opinion they indicate the cause within reasonable probability. The claimant is not required to prove his case beyond a reasonable doubt. 20 Am.Jur. 1099 (Evidence, § 1248); Hollinsworth v. Traubaugh, Ky.1954, 268 S.W. 2d 431; Sanchez v. Board of County Commissioners, 1957, 63 N.M. 85, 313 P.2d 1055, 1061; In re Smith, 1951, 72 Idaho 8, 236 P.2d 87. True, a post mortem would make possible a conclusive opinion, but it has never been regarded in this jurisdiction as a sine qua non to prove cause of death. The net result is that Dr. Hobbs' testimony has no probative value, one way or the other.

We have, then, one doctor saying that the decedent's exertion "could have" contributed to his death and the other two saying that it probably did. In this state of the record we see no valid basis for the board's conclusion, stated in the text of its opinion, that there is "no direct or positive medical testimony of any probative value that indicates that there was any direct contribution between the type of work decedent was doing and the heart attack." On the contrary, we are of the opinion that the board had no alternative but to find otherwise.

As of August 1, 1956, KRS ·342.005(1) was amended by insertion of the word "traumatic" preceding the words "personal injury." In a case arising before that date, Terry v. Associated Stone Co., Ky.1960, 334 S.W.2d 926, it was held that a physical exertion precipitating a coronary occlusion is a personal injury by accident within the meaning of the statute, whether the exertion be classed as "ordinary" or "extraordinary." We now squarely meet the question of whether the additional adjective, "traumatic," exacts a different result. The action of the board was clearly founded on the assumption that it does.

The simplest definitions of "trauma" and "traumatic" given in Webster's International Dictionary (1955) are, respectively, "an injury or wound, or the resulting condition," and "caused by a wound, injury or shock." What is an injury? The same authority defines it as "damage or hurt done to or suffered by a person or thing," and says that "hurt" is "injury; damage; detriment; harm; mischief." It would seem, therefore, merely on the strength of these common definitions, that once a condition is accepted as a personal "injury" it is necessarily accepted as traumatic.

In the State of Washington the compensation law defines "injury" as "a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom." Rem.Rev.Stat.Supp. § 7675. Under this statute it has been held uniformly that heart damage precipitated by exertion and strain is a compensable injury. Merritt v. Department of Labor & Industries of State, 1952, 41 Wash.2d 633, 251 P.2d 158; Metcalf v. Department of Labor & Industries, 1932, 168 Wash. 305, 11 P.2d 821, 823. "One of the hazards of employment to a workman afflicted with disease is that his work may involve exertions and strains which his weakened constitution may be unable to withstand. An injury which a workman sustains in the course of his employment is compensable under the act if it results from any shock, strain, or exertion which he is then unable to endure in his condition of health, whatever that may be." Barnes v. Department of Labor & Industries, 1940, 6 Wash.2d 155, 106 P.2d 1069, 1072.

In Maryland Cas. Co. v. Dixon, 1951, 83 Ga.App. 172, 63 S.E.2d 272, 274, a police officer recently hospitalized following a heart attack was involved in an automobile chase of a hit-and-run driver. Two or three days later, and some four hours after completing a regular duty shift, he suffered a fatal heart attack. A doctor testified that the return to work and excitement of the automobile chase were precipitating factors in the second heart attack. An award of compensation was affirmed. Though it does not appear that the Georgia statute included the word "traumatic," it is evident from the following portion of the opinion that it was so construed:

"The fact that such an attack is made more likely or probable by a pre-existing weakened physical condition is not a ground for denying compensation, if there is sufficient competent evidence that it was traumatic rather than ideopathic in origin. * * And, if the exertion of the employment was the immediate precipitating cause of the employee's death or disability, the mere fact that the attack itself was delayed somewhat, and occurred after the employee had left the premises of his employer, is not in itself sufficient reason for denying compensation."

While we do not say that this court would follow the Georgia case under the facts therein stated, we cite it and the Washington cases to illustrate the very broad meaning that has been given to the word "traumatic." That an equally liberal attitude has been adopted by our own court when the occasion demanded is illustrated by such cases as Wolfe v. American Rolling Mill Co.. 1939, 277 Ky. 395, 126 S.W.2d 835 (heat stroke from artificial heat), and Great Atlantic & Pacific Tea Co. v. Sexton, 1932, 242 Ky. 266, 46 S.W.2d 87 (tularaemia from handling rabbits).

In Terry v. Associated Stone Co., supra, it was pointed out that the various cases of personal injury from strain bear witness to this court's disinclination to entertain a restrictively technical conception of trauma. Although in Adams v. Bryant, Ky.1955, 274 S.W.2d 791, it was said that an injury need not qualify as "traumatic" in order to be compensable, a study of the cases theretofore decided (including those cited by appellee herein) leaves little doubt that the court ordinarily has proceeded on the contrary assumption (but see T. M. Crutcher Dental Depot v. Miller, 1933, 251 Ky. 201, 64 S.W.2d 466, 468). Moreover, the Adams opinion itself, in disavowing that the injury must be traumatic, does not necessarily say that the death in that case could not have been classified as of traumatic origin.

The Kentucky Workmen's Compensation Law was enacted in 1916. It was a massive and revolutionary piece of legislation with a broad social purpose. Quite naturally its interpretation through the years by the court has involved some amount of groping and adjustment, which is to say, inconsistency and change. We may freely concede that persuasive arguments can be based by either side in this case on selected opinions out of the past. In word and spirit they cannot be logically arrayed into a consistent and harmonious rationale. As they apply to the problem of injuries from overexertion or strain they are, in the main, reviewed in the Terry opinion, and we shall not again analyze them here. The problem is ably discussed in 47 Ky. Law Journal 437. Where other cases had sought to define trauma expressly, the line of exertion and strain cases cited in the Terry opinion had implicitly defined it by concrete example. The effect of the Terry case was to choose between the two, bringing coronary cases into line with the manifest policy of the court with respect to other types of internal injury resulting from strain, and, in fact, with what this court considers to be the sound and prevailing viewpoint in other jurisdictions.

The parties seem to agree that the purpose of the 1956 amendment in adding the word "traumatic" was to nullify the effect of the Adams case. But in view of the meaning of that slippery word as exemplified by the exertion and strain cases decided prior to the Adams case we are unable to say just what was the legislative intent of the 1956 amendment. It seems to us that the fundamental object of the compensation law is to secure the workman against physical disabilities resulting from his employment. Those disabilities are divided into two causal classes, accidental injuries and occupational diseases. In either case the real question is whether the disability was caused, either wholly or partially, by the work. Surely it was not and is not the intent of the legislature to leave a hiatus between the two categories, in which the employe may suffer a work-connected accidental injury that is not compensable. Certainly we are not persuaded that such an anomaly was wittingly contemplated by the legislature, especially in view of the clear injunction of the law that it be liberally construed.

In conclusion, and as pointed out in Terry v. Associated Stone Co., supra, where a work-connected exertion precipitates or triggers a disability in which a pre-existing disease is the predominating cause the award should represent only the contribution of the injury to the disability. The same principle applies here. See B. F. Avery & Sons v. Carter, 1924, 205 Ky. 548, 266 S.W. 50, 52.

The cause is reversed with directions that it be remanded to the board for appropriate determination in accordance with the principles stated in this opinion.