**Norman HAYCRAFT, Appellant,**

**v.**

**CORHART REFRACTORIES CO., etc., et al., Appellees.**

Supreme Court of Kentucky.

Oct. 1, 1976.

Rehearing Denied Jan. 14, 1977.

W. David Klingman, Frockt & Klingman, Louisville, for appellant.

Robert C. Ewald, Wyatt, Grafton & Sloss, Louisville, for appellee Corhart Refractories Co.

· Louis G. Mayer, Asst. Counsel, Dept. of Labor, Louisville, Kenneth E. Hollis, Gen. Counsel, Dept. of Labor, Frankfort, for appellee Kentucky Dept. of Labor and Custodian of the Special Fund.

PALMORE, Justice.

Norman Haycraft, an employe of the appellee Corhart Refractories Company, appeals from a judgment affirming an order of the Workmen's Compensation Board dismissing his claim for compensation based on an injury or injuries to his back.

The case is of unusual importance for the reason that it requires a determination of what was meant by the 1972 legislative definition of the word "injury," KRS 342.-620(1).[1]

---

1. Ch. 78, § 2, Acts of 1972, eff. Jan. 1, 1973.

Prior to the 1972 act KRS 342.005 limited compensation coverage to disabilities resulting from "traumatic personal injury sustained by the employe by accident" or from occupational diseases. The words "traumatic," "injury," and "accident," not having been statutorily defined, provided a judicial battlefield for years on end [2] until at last it was settled that whenever "the physical effort of a man's work precipitates his internal breakdown resulting in disablement," he has sustained a traumatic injury by accident within the meaning of the compensation statute.[3] Whereas, however, *Terry v. Associated Stone Co.*, Ky., 334 S.W.2d 926, 930 (1960), had spoken in terms of "a specifically identified effort," *Hudson v. Owens*, Ky., 439 S.W.2d 565, 569 (1969), recognized that causation need not be localized in a single event. It is enough that the disability be fairly traceable, wholly or in part, to the work.

Against this background of case-law (assuming that legislators pay attention to such matters) the 1972 General Assembly at its regular session repealed KRS 342.005 and replaced it with superseding provisions including KRS 342.620(1), which defined the word "injury" as follows:

" 'Injury' means any work related harmful change in the human organism . . . but does not include any communicable disease unless the risk of contracting such disease is increased by the nature of the employment. 'Injury' when used generally . . . shall include an occupational disease."

■ Though we are not in this case concerned with a communicable disease, we think that the statutory exclusion of such a disease unless the nature of the work has increased the risk of contracting it reflects a definite legislative policy to the effect that although a particular affliction is of common occurrence among the population in general, it may nevertheless be found work-connected, hence compensable, when the nature of the victim's occupation has increased the victim's susceptibility to it.[4]

■ Prior to 1972 342.120, the apportionment statute, provided among other things that if a dormant nondisabling "disease condition" was aggravated or aroused into an active disability through the occurrence of a compensable injury, liability would be apportioned between the employer and the Special Fund. KRS 342.120(1)(b). Whether a pre-existing infirmity was a "disease" and whether it was "active" or "dormant" were important questions, because (1) if it was not a disease, and had not become disabling, the employer was liable for the entire disability triggered by the injury, and (2) if it had become disabling prior to the accident (that is, if it was an "active" disability), then regardless of whether it was or was not a "disease" condition the employer was liable only for the portion of the disability that would have resulted from the accidental injury in the absence of the pre-existing condition. Under this state of the law it was held that progressive physical infirmities such as emphysema, chronic bronchitis, and degenerative disc conditions were not "disease" conditions even though they might have been so classified in medical terminology.[5] See, for example, *Carol Coal Company v. Harris*, Ky., 477 S.W.2d 783, 784 (1972); *Young v. City Bus Company*, Ky., 450 S.W.2d 510, 514 (1970); and *Yocom v. Fayard*, Ky., 515 S.W.2d 614, 615 (1974).

■ By the same act in which the word "injury" was defined, the 1972 General Assembly re-worded KRS 342.120(1)(b) to read, "dormant disabling *disease or condi-*

---

2. See, for example, discussions in *Terry v. Associated Stone Co.*, Ky., 334 S.W.2d 926 (1960); *Grimes v. Goodlett and Adams*, Ky., 345 S.W.2d 47 (1961); and *Hudson v. Owens*, Ky., 439 S.W.2d 565 (1969).

3. *Hudson v. Owens*, Ky., 439 S.W.2d 565, 568 (1969).

4. This same policy is reflected in the statutory provisions covering pneumoconiosis. See, in particular, the presumption created by KRS 342.316(7).

5. Similarly, the term "disease" does not include congenital conditions such as spondylosisthesis. Cf. *Appalachian Regional Hospitals, Inc., v. Brown*, Ky., 463 S.W.2d 323, 325–326 (1971).

*tion*" [6] in lieu of "dormant disabling *disease condition*" (emphasis added), thus shifting liability from the employer to the Special Fund for that portion of the workman's disability ascribable to a pre-existing non-disabling condition that was not a "disease." See discussion in *Yocom v. Gibbs*, Ky., 525 S.W.2d 744 (1975).

Throughout this whole process of interpretation and revision the status of disabilities resulting from spinal disc conditions has been a nagging problem not only to the victims of the disorder but to this court and, presumably, to the Workmen's Compensation Board. Unless the disability was precipitated or "aroused" by some identifiable or noticeable incident that occurred on the job, as, for example, in *Rowe v. Semet-Solvay Division Allied Chemical & Dye Corp.*, Ky., 268 S.W.2d 416 (1954), it simply was not compensable, because it was held to have resulted from a normal degenerative process rather than the work. We think now, however, especially in view of the 1972 legislation noted above, that this view is unrealistic and unnecessarily restrictive.

■ It has been observed many times that arthritic changes in the spine are a part of the normal aging process, or "wear and tear," which is common to the general public regardless of one's individual occupation. Nonetheless, just as constant exposure to the dust and dampness of underground coal mining is certain to increase the risk of emphysema and chronic bronchitis, so are the rigors of strenuous manual labor bound to hasten toward its breaking point the debilitating process of a degenerative spinal disc. We are therefore of the opinion that if it be found, or should be found, that the nature and duration of the work probably aggravated a degenerative disc condition to the degree that it culminated in an active physical impairment sooner than would have been the case had the work been less strenuous, to that extent the pre-existing condition is itself an injury

as now defined in KRS 342.620(1), and that compensation for a disability to which it has contributed should be apportioned between the employer and the Special Fund as follows: (1) to the Special Fund, that portion of the disability that probably would exist regardless of the work; (2) to the employer, the remainder, being the percentage attributable to the work. With this criterion in mind we shall proceed to examine the facts of this particular case.

■ The claimant's application for workmen's compensation benefits, filed on June 5, 1974, gives the date of injury as April 11, 1974. At that time he was almost 44 years old and had worked continuously for the defendant employer for 17 years. All of the jobs to which he had been assigned in the course of this employment entailed hard physical labor, such as using a sledgehammer and lifting and shifting heavy objects and materials. He had experienced no discomfort in his back until September 14, 1959, on which date he had a sudden severe pain in the back while swinging a sledgehammer. The incident was reported to the employer, and after examination by its physician, Dr. L. H. Segerberg, the claimant was admitted to the hospital with a diagnosis of low back sprain and possible disc injury.[7] He was off work for about four weeks and under the care of a physician for three or four months. A back brace was prescribed, which he wore regularly for "a right smart while" and has worn intermittently ever since. He did not file a claim for or receive workmen's compensation for this injury but received sick-pay from the employer.

Following the 1959 injury the claimant says he never got back to feeling "100% normal" and two or three times a year suffered "flare-ups that would get me down in the back." He had pain in the back while he worked which, as he described it, "would draw me one-sided," and wore his brace "on and off." There have been two

6. Ch. 78, § 17, Acts of 1972, eff. Jan. 1, 1973.

7. This, of course, was a work-connected "injury" under any state of the law heretofore prevailing. Cf. *Rowe v. Semet-Solvay Division Allied Chemical & Dye Corp.*, Ky., 268 S.W.2d 416 (1954); *Wood-Mosaic Co. v. Shumate*, 305 Ky. 368, 204 S.W.2d 331 (1947).

separate incidents not related to his work in which his back was injured or re-injured. On one of these occasions he slipped on some steps at home and was X-rayed by Drs. Fischer and Zoeller, but he does not recall whether he lost any work at that time. On the other such occasion, in September of 1964, his back was hurt when an automobile in which he was riding turned over, following which he was treated by Drs. Fischer, Leatherman and Zoeller and remained under their care for "a month or two," was hospitalized for six days, and was off work for about one month. There was no surgery.

In March of 1972, while engaged in turning over heavy slabs of graphite, the claimant got into a truck or tractor to move some of the material, and as he dismounted "it caught me and I went down to my knees." The employer sent him to the hospital and he was off work for two days, after which he was put on light duty for about three weeks, meanwhile remaining under the care of his regular physician, Dr. Nathan Zimmerman, a general practitioner. He then resumed his customary duties involving hard manual labor.

On April 11, 1974, the claimant's mother was in Sts. Mary and Elizabeth Hospital in serious condition and he took time off in order to stay with her for the day. He spent most of the day sitting in a chair. When he was relieved by his wife that afternoon or evening he told her that he felt bad and would go on home. Upon reaching home he says that his back and left leg were giving him so much pain that he could hardly get out of the car. On the next morning his wife took him to St. Joseph's Hospital and reported the circumstances to his supervisor at work. At this point Dr. Zimmerman called in Drs. Jelsma and Ross, neurological surgeons, who for the first time performed a lumbar myelogram in order to ascertain definitely the condition of the claimant's spine.

The myelogram disclosed a disc-type defect on the left side of L5 and a smaller defect on the right side of L4. On April 23, 1974, Dr. Jelsma surgically removed an extruded disc with a sequestrated fragment at the left side of the L5 interspace and removed some spurring from the L5–S1 space. The claimant was eventually released for work on August 26, 1974, and at the time of his testimony in this proceeding was still on his regular job with the same employer, though he said that he has "a lot of pain in my hip and down my leg," cannot stoop and bend as well as before, nor stay on his feet as long, and cannot lift as much.

The medical evidence in the record consists of a report by Dr. Armand K. Fischer, a specialist appointed pursuant to KRS 342.121 to examine the claimant after the Special Fund had been made a party, and the depositions of Dr. Nathan Zimmerman and Dr. Lawrence F. Jelsma. We summarize their conclusions with reference to the back condition as follows:

*Dr. Fischer.* Examination, including Xrays, made on August 2, 1974. Diagnosis: Chronic low back sprain with multiple degenerated discs. "It is my opinion this patient had a diseased condition of his spine prior to 4/11/74; namely, degenerated discs in the lower spine and arthritic changes in the lower spine. It would be my opinion that he had permanent disability in his back prior to 4/11/74, because he had intermittent flare-ups of his back pain and had to wear his brace and all of his back symptoms began in 1959. It would be my opinion that he sustained disability as a result of the accident [8] directly on 4/11/74. It would be my opinion that he aggravated an already diseased condition of the lower lumbar spine; namely, degenerated discs at L3, 4 and 5 into further disability reality as a result of the accident of 4/11/74."

Dr. Fischer concluded that the claimant now has a 35% partial permanent disability,

---

8. The case history recited in Dr. Fischer's report says that after recovering from the 1972 injury the patient "continued in his regular job until 4/11/74 when he had another onset of back pain . . . ." It does not mention any event that would be characterized as an "accident" in the ordinary lay sense of the word.

consisting of 10% from injuries to his back prior to April 11, 1974, 5% from an old nonwork-connected arm fracture, 10% from the incident or "accident" of April 11, 1974, and 10% from aggravation of the pre-existing back condition by the April 11, 1974, occurrence.

*Dr. Zimmerman.* On April 12, 1974, the claimant reported that while visiting a member of his family in the hospital "he had an acute onset of back pain without at that time having done anything except just simply sitting there. He had not arisen, he had not changed or altered his attitude in terms of position, and it followed from there that the pain became severe," etc. Subsequent evaluation and treatment revealed disc defects at L4 on the right and L5 on the left. The previous injuries in 1959 and 1972 had been referable only to the right side. Hence the L5 injury must have occurred more recently. Whether the claimant actually had a disc injury in 1959 cannot be definitely ascertained, because no myelography had been done until 1974. It was Dr. Zimmerman's estimate that he was disabled to the extent of 10% from the 1972 or 1959 injuries and an additional 20% from the L5 or left-side injury manifested in 1974.

With respect to the causal relationship between the claimant's condition and his work, Dr. Zimmerman stated that in his opinion the work did have something to do with the 1974 incident: "discs often protrude and occur after the injury occurs . . . he does do heavy work. Certainly sitting in a position in a hospital bed [sic] doing absolutely zilch or nothing should not have created the disc injury he recently acquired. On the basis of the fact that he has stated to me that he has done no other heavy work, had done no other injury to himself, the left side occurred for the first time on that occasion, and I am only assuming and I am agreeable to assuming that his heavy work did lead eventually to the rupture of the disc on his left side."

*Dr. Jelsma.* First saw claimant on April 15, 1974. Case history heretofore recited in this opinion.[9] Estimate of permanent partial disability: 15% total, 10% being attributable to "the disc rupture and extruded fragment with its subsequent surgical removal at L5 on the left" and 5% attributable to the pre-existing condition. It was Dr. Jelsma's opinion that the claimant's heavy work over the years was an aggravating factor in causing the 1974 incident: "I think he had an underlying disc disease, and I think that he had a degenerated disc, and I think this is the sort of thing that is aggravated by heavy work and that at the particular time he stood up or whatever he was doing was when the disc happened to rupture or actually extruded from this diseased disc space that had been chronically injured over a period of time" Question: "I guess what I am really driving at is that you really can't attribute his problems to one specific instance, but rather it is a condition that occurred over a long period of time of heavy work, of a chronic back problem that finally brought forth into the final problem he had on April 15th [sic], but it was the result of many years of problems, a wear and tear on his back?" Answer: "Yes . . . . Probably weeks to months."

Dr. Jelsma was of the opinion that the 5% disability pre-existing the April 11, 1974, incident was "active" in that "he had a problem in his back that permitted a small disability and was a source or reason for his complaints that he would have had of intermittent back pain." In short, he explained that before April 11, 1974, the L4 condition was slightly disabling but the L5 condition was not disabling.

9. Though he did not record it in his notes, Dr. Jelsma's version of the case history differed somewhat from the testimony of Drs. Fischer and Zimmerman and the claimant in that his recollection was that on April 11, 1974, the claimant "was sitting in a hospital chair at his mother's bedside when he had noted an onset of left leg pain or had just gotten up from spending the night in a chair . . . . As I mentioned, I don't have that written down . . . he spent the night with her, and he happened to stand up or did something after this prolonged time in a chair at her bedside, I believe, and he noted left leg pain."

On the basis of the evidence it seems obvious to us that this claimant has undergone a "harmful change in the human organism" that is to some degree work-related. The board's conclusion, however, was as follows:

"The Board is aware of the definition of 'injury as is defined in KRS 342.620(1), and agrees that the term is broader than it formerly was, however, we do not opine that all degenerative diseases or conditions are compensable. The plaintiff in this case has an extensive history of back problems and it is difficult for us . . . to connect his problems with his work. For these reasons we are compelled to dismiss the claim."

■ We agree that not all degenerative diseases or conditions are compensable. We agree also that it is difficult to assess the degree of relationship between this claimant's work and his disability. But difficult or not, that such a relationship does exist can hardly be avoided. Not only is it beyond question that the nature of the work was such that it probably aggravated and accelerated the degenerative disc condition, but also there have been two incidents of actual injury to the man's back arising out of and in the course of his employment.

■ To the extent that the claimant was actively disabled prior to April 11, 1974, under KRS 342.120 he cannot be compensated. For the remainder of his disability attributable to the present condition of his back he is entitled to compensation to be divided between the employer and the Special Fund, the employer's portion to be assigned not on the basis of how much of it would have occurred in the absence of the degenerative disc condition,[10] but on the basis of how much the work has contributed to it:

---

10. Though KRS 342.120(3) provides that when a previously-*existing* condition that is nondisabling *becomes* disabling through the agency of a work-related injury the employer shall be liable only for such portion (if any) of the disability as would have resulted from the injury in the absence of the pre-existing condition,

We find no merit in the contention that the employer did not receive timely notice of the injury.

The judgment is reversed with directions to remand the proceeding to the Workmen's Compensation Board for reconsideration in accordance with this opinion.

All concur excepting STEPHENSON, J., who dissents.

we construe that provision as applicable only to a pre-existing condition that is not attributable in any degree to the work. What we hold here is that a dormant pre-existing condition, or pre-disposition to injury, which itself is work-related, falls in a different category.