RYAN'S FAMILY STEAKHOUSE,
Appellant,

v.

Anita THOMASSON, et al., Appellee.

No. 2001–SC–0891–WC.

Supreme Court of Kentucky.

Aug. 22, 2002.

Mary E. Schaffner, Woodward, Hobson & Fulton, Louisville, for Appellant, Ryan's Family Steakhouse.

Daniel Caslin, Owensboro, for Appellee, Anita Thomasson.

## OPINION OF THE COURT

The Court of Appeals determined that objective medical findings supported the claimant's medical diagnosis, reversed a Workers' Compensation Board (Board) decision to the contrary, and reinstated the claimant's permanent partial disability award. In doing so, the Court also rejected arguments that the Administrative Law Judge (ALJ) had misinterpreted the terms "traumatic event" and "proximate cause" when construing KRS 342.0011(1). Although the employer maintains that the Court erred with respect to all three issues, we have concluded that the decision was proper and, therefore, we affirm.

The claimant's duties as a restaurant worker included baking, cooking, cleaning, and stocking. She testified that after working a double shift on February 1, 1999, she cleaned the kitchen. While doing so, she scrubbed the underside of a shelf that was high above the food preparation table. This required her to lean over the table, twist her head and neck backward in order to see what she was

doing and extend her right arm upward while scrubbing. The task took about an hour. The next morning she awoke with severe pain and stiffness in her neck and was barely able to turn her head. She testified that she reported her symptoms to her supervisor and that although she worked her usual shift that day, she was unable to return to work thereafter. Her supervisor testified, however, that she did not inform him of the incident until February 24, 1999.

As of February 8, 1999, the pain had not subsided, so the claimant visited her family physician and was referred to Dr. Eggers, a neurosurgeon. On March 9, 1999, Dr. Eggers noted a restricted range of motion in the neck and pain in the right neck and trapezius that he viewed as musculoligamentous in origin. He found nothing to suggest radiculopathy. At a follow-up on April 26, 1999, Dr. Eggers noted a full range of motion in the neck but also noted that when the claimant relaxed, her right shoulder drooped. Unsure of the significance of this, he indicated that if the pain persisted, an orthopedic consultation might be helpful.

On March 23, 1999, the claimant saw Dr. Liebenauer, a chiropractor and described, in detail, the types of physical activities that her work required. She related a medical history that included having experienced "cricks" in her neck that were not severe, an automobile accident that occurred 26 years before, and the recent incident at work. She also reported that she had been told that her C5 vertebra was congenitally deformed. Dr. Liebenauer conducted an extensive physical examination and a number of tests, noting a kyphotic alignment, cervical paraspinal spasms, trigger points, limited cervical range of motion, and reduced grip strength. She diagnosed acute spasmodic torticollis, possible cervical disc herniation

or rupture, or thoracic outlet syndrome. When chiropractic treatment failed to relieve the claimant's symptoms, Dr. Liebenauer referred her to Dr. Kern, a neurosurgeon.

Dr. Kern noted a history of neck pain since February, 1999, which he attributed to repetitive motion at work. He ordered an MRI, the results of which indicated cervical kyphosis at C3–4 but no herniated discs. He observed that the claimant's right bicep reflex was decreased and thought that she might have C6 radiculopathy. Although he recommended a cervical myelogram, the test was not performed. He did not consider the claimant to be a surgical candidate.

Dr. Liebenauer then referred the claimant to Dr. Olson, a neurologist who specialized in movement disorders. Dr. Olson took the claimant's history and reviewed her medical records, noting that the extensive records from Dr. Liebenauer documented and supported the clinical history that the claimant gave. His report indicates that he conducted an extensive physical examination of the claimant's head, eyes, ears, nose, throat, neck, and extremities, listing his observations. He also conducted the Folstein Minimental State Examination (a test of higher cortical function), examined and tested the cranial nerves, and conducted a motor and sensory examination that included testing of her movement and senses. He noted a limited range of motion of the head and neck and a tendency for the head to turn to the left. Relying on the history and physical examination, he diagnosed spasmodic torticollis, a movement disorder. He noted on the Form 107 report that the condition may arise from a number of causes and that, in his opinion, the claimant's prolonged and awkward positioning while cleaning the underside of the shelf at work was a "plausible cause" of her condition. He la-

ter testified that an abnormal posture causes a neural insult due to a decreased supply of blood to the peripheral nerve and produces a dystonic spasm. He indicated that the head injury some 26 years ago was a possible cause of the claimant's condition and also that the condition can arise spontaneously, but he explained that working in an abnormal posture was the most likely cause because the symptoms arose shortly after she did so. He assigned an AMA impairment of 28–51%.

Dr. Gleis, an orthopedic surgeon, examined the claimant on behalf of the employer. He noted that she sat in an abnormal posture, with her head extended over the back of the chair. He also noted that during the Rhomberg test and when seated on the examination table, she fell backward when her eyes were closed. His examination revealed no evidence of muscle spasm, although when she turned her head to the right, she twisted it in a posture that he described as dysmetria. Although he diagnosed neck pain and abnormal grip strength testing, he was not convinced that the claimant's symptoms were caused by the incident at work. He also was not convinced that continued chiropractic treatment or certain medical treatments were necessary. In his opinion, the claimant could return to work with restrictions to avoid frequent neck flexion and to lift no more than 20 pounds.

At the hearing, the claimant stated that she continued to experience neck and shoulder pain that worsened with activity and continued to require medical treatment. After reviewing the lay and medical evidence, the ALJ determined that the claimant sustained a work-related injury, that she was credible with regard to the date upon which she gave notice, that her impairment rating was 35%, and that although she could not return to her previous employment, she was not totally disabled. The Board reversed to the extent of determining that the record was "devoid of 'objective medical findings' which produced a change in the human organism." Appealing the Court of Appeals' decision to reinstate the award, the employer maintains the claimant did not sustain a compensable injury under the applicable version of KRS 342.0011(1) and raises the following three arguments: 1.) that the incident of February 1, 1999, did not constitute a "traumatic event" as contemplated by KRS 342.0011(1); 2.) that there was no substantial evidence that the incident was "the proximate cause" of a harmful change; and 3.) that the award was not supported by "objective medical findings" as that term was construed in *Gibbs v. Premier Scale Co.*, Ky., 50 S.W.3d 754 (2001).

Relying upon the definition that was set forth in *Jellico Coal Co. v. Adkins*, 197 Ky. 684, 247 S.W. 972 (1923), the employer's position is that when inserting the word "traumatic" into the amended definition of "injury," the legislature intended that physical force must occur before an event will constitute an "injury." The employer argues that although the claimant worked in an awkward position, she did not sustain any trauma and, therefore, that the event did not come within KRS 342.0011(1).

In *Jellico v. Adkins, supra,* a miner became ill from the effects of "bad air," but the Court affirmed the dismissal of his workers' compensation claim on the ground that he failed to show that his disability resulted from a "traumatic injury by accident." The claim was decided under the 1916 Act, which authorized compensation for a "personal injury by accident" but did not cover an occupational disease unless it was the "natural and direct result of a traumatic injury by accident." Relying upon contemporary dictio-

nary definitions, the Court determined that the use of the word "traumatic" implied the presence of an external physical force that was directed against the worker's body and that inhaling "bad air" did not come within the definition. The Court later determined, however, that the dictionary definitions of "trauma" could be as consistently construed to include "any independent influence or cause external to the body coming into direct contact with, and causing injury to, the physical structures thereof." *Great Atlantic & Pacific Tea Co. v. Sexton*, 242 Ky. 266, 46 S.W.2d 87, 89 (1932). In *Sexton*, the worker scratched his finger while splitting kindling at home and contracted tularaemia via the scratch when butchering infected rabbits at work. Noting that an accident was an unusual, unexpected, and undesigned event, the Court determined that, in contracting tularaemia, the worker had sustained a "traumatic injury by accident." Thus, his disease was compensable.

In *Adams v. Bryant*, Ky., 274 S.W.2d 791 (1955), the Court determined that a worker who attempted to rescue fellow co-workers in a mine collapse and later died from shock, overexertion, and exposure had sustained an accidental injury. The decision emphasized that despite the Act's restrictions on occupational disease claims, it did not limit coverage for injuries to those that were traumatic in nature. In 1956, the legislature amended the Act in order to define a compensable "injury" as a "traumatic personal injury by accident." 1956 Ky. Acts ch. 77, § 1.

When faced with an argument that the 1956 amendment was a legislative response to *Adams v. Bryant*, the Court noted that prior courts were not "fastidious" in construing the term "trauma" and that the term was discarded altogether in *Adams v. Bryant*. Thus, the Court determined that where the physical strain of work acts upon a pre-existing disease and precipitates a heart attack, the resulting condition is compensable as an injury. *Terry v. Associated Stone*, Ky., 334 S.W.2d 926 (1960). Confronting the argument again, in *Grimes v. Goodlett and Adams*, Ky., 345 S.W.2d 47 (1961), the Court stated that it was unable to discern the intent of the amendment and that the real question was whether or not the worker's disability was caused by work. It concluded, therefore, that a heart attack that was partially caused by work-related exertion or stress was a compensable traumatic personal injury by accident. Shortly thereafter, in a case in which a laborer suffered an internal hemorrhage while working, the Court again explained that if the strain of a worker's exertions causes bodily harm, the injury is accidental and that if an injury that is caused by a work-related external force, including the physical exertion of working, it is traumatic. *North American Refractories v. Jackson*, Ky., 346 S.W.2d 10, 12–13 (1961), relying upon *Coleman Mining Co. v. Wicks*, 213 Ky. 134, 280 S.W. 936 (1926); see also, *Hudson v. Owens*, Ky., 439 S.W.2d 565, 568 (1969). Although the word "traumatic" was removed in 1972, and the word "injury" was redefined as "any work-related harmful change in the human organism," the Court continued to apply the same principles thereafter. 1972 Acts ch. 78, § 2; see, for example, *Stovall v. Dal–Camp, Inc.*, Ky., 669 S.W.2d 531 (1984). Furthermore, in *Yocom v. Pierce*, Ky., 534 S.W.2d 796 (1976), the Court determined that physical trauma was no longer required and, therefore, that when a dormant nondisabling mental condition was aroused by the mental exertion of work, a resulting mental breakdown was compensable as an injury.

In 1994, the legislature amended KRS 342.0011(1) again in order to require that a psychological, psychiatric, or stress-related change in the human organism be "a direct

result of a physical injury." 1994 Ky. Acts ch. 181, Part 1, § 1. The apparent purpose of this amendment was to exclude compensation for so-called "mental-mental" claims. But because "injury" continued to be defined in terms of the harmful change rather than the factor that caused the change, the amended definition did not address instances where mental trauma or exertion causes a harmful physical change, and a harmful mental change directly results. As part of a comprehensive restructuring of the Act that became effective on December 12, 1996, KRS 342.0011(1) was further amended to provide as follows:

> (1) "Injury" means any work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause producing a harmful change in the human organism evidenced by objective medical findings. "Injury" does not include the effects of the natural aging process, and does not include any communicable disease unless the risk of contracting the disease is increased by the nature of the employment. "Injury" when used generally, unless the context indicates otherwise, shall include an occupational disease and damage to a prosthetic appliance, but shall not include a psychological, psychiatric, or stress-related change in the human organism, unless it is a direct result of a physical injury.

As we explained in *Lexington–Fayette Urban County Government v. West*, Ky., 52 S.W.3d 564, 566 (2001), the effect of this amendment is that the term "injury" now refers to the traumatic event or series of such events that causes a harmful change rather than to the harmful change, itself. Under the amended definition, a "physical injury" is an event that involves physical trauma, without regard to whether the harmful change that results is physical, psychological, psychiatric, or stress-related. *Id.* Thus, the 1996 definition makes it clear that a harmful change that is psychological, psychiatric, or stress-related must result from an event that involves physical rather than mental trauma. We have concluded, therefore, that by redefining "injury" as a "traumatic event," the legislature sought to limit compensation for psychological, psychiatric, and stress-related claims more effectively. Had its purpose been to overrule decisions that permit compensation where the physical exertion of work (rather than an external physical force) causes a harmful change, it would have defined the word "traumatic" to indicate as much.

■ We turn now to the significance of the phrase "the proximate cause producing" in determining whether a work-related traumatic event is the cause of a worker's injury. The employer maintains that the use of this phrase demonstrates the legislature's intent to limit compensability to harmful changes that are solely caused by work-related trauma. We note, however, that we rejected such a notion in *McNutt Construction v. Scott*, Ky., 40 S.W.3d 854 (2001). Furthermore, Dr. Olson clearly explained why he thought that the February, 1999, incident was the most likely cause of the claimant's problems, and he attributed no portion of her condition to another cause. Contrary to what the employer would have us believe, nothing in the evidence compelled a finding that the automobile accident some 26 years earlier, the previous "cricks" in the neck, or a spontaneous onset contributed to causing the claimant's condition.

■ Finally, we reject the employer's assertion that the claimant's harmful change was not demonstrated by objective medical findings as required by KRS 342.0011(1). The employer relies upon

*Gibbs v. Premier Scale Co., supra,* in which the worker failed to introduce objective medical findings that demonstrated the existence of the symptoms of which he complained and which led his physician to diagnose a traumatic brain injury. *Staples, Inc. v. Konvelski,* Ky., 56 S.W.3d 412 (2001), subsequently illustrated the type of evidence that was required and explained that although KRS 342.0011(1) requires objective medical findings of a harmful change, it does not require such evidence of causation. In the instant case, both Dr. Liebenauer and Dr. Olson based their diagnosis of spasmodic torticollis not only on the symptoms that the claimant related to them but also on their direct observations of the claimant and the results of the extensive testing that they performed. Thus, we find no error in the ALJ's reliance on their testimony when determining that the claimant sustained a compensable injury.

The decision of the Court of Appeals is affirmed.

All concur.