RENDERED: APRIL 27, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0386-WC

LEXINGTON FAYETTE URBAN COUNTY            APPELLANT
GOVERNMENT

V.                   ON APPEAL FROM COURT OF APPEALS
                         NO. 2021-CA-0033
               WORKERS' COMPENSATION BOARD
                         NO. 2019-WC-0042

MICHAEL GOSPER; HONORABLE            APPELLEES
JONATHAN R. WEATHERBY, JR.,
ADMINISTRATIVE LAW JUDGE; and
WORKERS' COMPENSATION BOARD

**OPINION OF THE COURT BY JUSTICE NICKELL**

**<u>AFFIRMING</u>**

The Lexington-Fayette Urban County Government (LFUCG) appeals from a Kentucky Court of Appeals opinion affirming an opinion of the Workers' Compensation Board (Board) which, in turn, had affirmed the July 25, 2020, opinion and order of an administrative law judge (ALJ) determining the bilateral knee condition of Michael Gosper (Gosper) was caused by work-related cumulative trauma and awarding permanent partial disability (PPD) income and medical benefits, along with affirming the ALJ's August 20, 2020, order overruling LFUCG's petition for reconsideration. Upon a careful review of the briefs, the record, and the law, we find no error and affirm.

## I. SUMMARY OF EVIDENCE AND PROCEDURAL HISTORY

Gosper testified by deposition and at the final hearing. In his Form 101, he alleged his bilateral knee injuries had been caused by cumulative trauma sustained over a roughly eighteen-year period while he worked exclusively for LFUCG as a firefighter and EMT paramedic, beginning on June 18, 2001. He testified his heavy and strenuous duties required him to wear and carry up to eighty pounds of gear, tools, and associated firefighting items while climbing and crawling up and down trucks, ladders, and locales; lifting and dragging heavy hoses; pulling and demolishing ceilings and other structures; and extricating, dragging, or carrying patients and victims. In addition, he was required to complete vigorous training exercises four times per year.

Gosper noted his prior medical history included a 2007 work-related torn meniscus right knee injury which required surgical repair by his treating orthopedic surgeon, Dr. John Balthrop. After a period of recuperation, he returned to normal employment duties with no restrictions and remained symptom-free. Thereafter, he reported occasional "minor bumps and bruises" associated with the nature of his job but noted he missed no work until 2017, some ten years later. In 2012, his primary care physician had begun prescribing Arthrotec, a nonsteroidal anti-inflammatory drug (NSAID), for occasional minor swelling of his right knee arising after particularly grueling "duty days and workdays." However, except for the prior meniscus injury, Gosper reported no other serious knee problems.

Gosper identified December 13, 2017, as the date his condition manifested. On that date, he returned to Dr. Balthrop for medical evaluation and treatment of "unbearable" bilateral knee pain and significant range of motion limitation. The symptoms had arisen earlier in 2017 and had gradually progressed in severity to the point he felt precluded from safely performing his employment duties.

Initially, Dr. Balthrop ordered MRIs and increased Gosper's prescription for Arthrotec. Ultimately, however, Dr. Balthrop performed a total right knee replacement on July 12, 2018, and a total left knee replacement on August 23, 2018. Following completion of physical therapy in December 2018, he advised Gosper against returning to his former work activities. Gosper testified his bilateral knees have remained pain-free postoperatively, with full range of motion, and without need of medication.

When Dr. Balthrop advised him his bilateral knee conditions were work-related during the December 13, 2017, evaluation, Gosper notified his supervisor at LFUCG. His employer had thereafter provided all medically necessary consultations, treatments, and surgeries relative to the bilateral knee conditions and continued payment of Gosper's wages pending his full recuperation.

When Gosper was unable to return to his normal full-time work duties, he applied for and was awarded disability retirement benefits effective April 12, 2019, due solely to his bilateral knee conditions. His last official full-duty day

3

with LFUCG was April 11, 2019, but he remains employed on a part-time basis as a Toyota valet.

Both Gosper and LFUCG filed medical records of Dr. Balthrop, Gosper's treating orthopedic surgeon. Dr. Balthrop was thereafter deposed on December 6, 2019.

Dr. Balthrop originally examined Gosper in 2006 relative to complaints of right knee pain. At that time, he diagnosed a moderate degree of varus[1] deformity, provided a course of conservative treatment, and ultimately performed arthroscopic surgery. Over ensuing years, he examined Gosper multiple times, occasionally prescribing arthritic medication. He opined Gosper's varus deformity increased over time and noted development of left knee pain by 2013. He ultimately performed the bilateral total knee replacement surgeries in 2018, noting Gosper appeared satisfied with the outcome, and stating any impairment rating should be based on upon Gosper having achieved a good result.

Dr. Balthrop testified Gosper "very likely" experienced significant stress on his joints due to the length of his employment as a firefighter and EMT paramedic, the heaviness of his gear and equipment, and the strenuous aspects of his job duties. He agreed the physically exacting work demands

---

[1] Latin adjective describing any joint in an extremity that is deformed in such a way that the more distal of the two bones forming the joint deviates toward the midline, as in bowleg. [Mod. L. bent inward, fr. L. knock-kneed]. *Stedman's Medical Dictionary,* (28th ed., 2006), p. 2091.

4

combined with the varus deformity to accelerate gradual deterioration of Gosper's knees, opining:

> Q: ... [I]f you combine his physical makeup, combine the arduous nature of his work, combine the physical activities that he was involved in over a period of time, clearly his knee deterioration and ultimate need for knee joint replacement was accelerated by the combination of those factors?
>
> A: ... I will say that his occupation and what he did, carrying excessive weight and being fairly strenuous would be akin to being an athletic event at an age in which most people are no longer engaging in the type of strenuous event, if you add 19 years of strenuous activity with a predisposed, anatomic tendency to put stress on his knees, the combination of A plus B accelerated his wear over another individual.

LFUCG filed medical records obtained from the Family Practice Associates. These records indicated Gosper had complained of bilateral knee pain on August 21, 2012, was diagnosed with osteoarthritis, and was prescribed Meloxicam, an NSAID. When he returned on April 26, 2013, and May 3, 2013, complaining of right knee pain radiating into his right leg, x-rays revealed mild arthritis. At that time, he was prescribed Baclofen, a skeletal muscle relaxant, and Lortab, a pain relief medication, and was referred back to Dr. Balthrop, his treating orthopedic surgeon.

The medical records indicated Gosper treated with Dr. Balthrop on nine occasions from May 2013 through March 2014, with initial complaints of right knee pain expanding to include bilateral knee pain. During this period, Dr. Balthrop obtained a right knee MRI; diagnosed degenerative joint disease; prescribed various NSAIDs, and administered four injections.

Three and a half years later, records indicated Gosper returned to the Family Practice Associates on October 2, 2017, to refill his medication. At that

5

time, Dr. Wesley Johnson determined his osteoarthritis had stabilized and recommended continuing his medication regimen. Thereafter, records establish Gosper returned to Dr. Balthrop on December 13, 2017, with increased complaints of constant bilateral knee pain, particularly with weight bearing activity. Dr. Balthrop noted increased bow-leggedness and greater range of motion limitation. Examination and x-ray films revealed increased varus collapse to approximately 17 degrees. Dr. Balthrop opined Gosper's arthritis was more severe medially, consistent with the angulatory deformity, and recommended additional injection therapy.

Gosper also filed various medical records prepared by Dr. Balthrop. A July 12, 2018, operative report relating to the right total knee arthroplasty listed a preoperative and postoperative diagnosis of primary degenerative joint disease of the right knee. An August 23, 2018, operative report relating to the complex left total knee arthroplasty similarly listed a preoperative and postoperative diagnosis of primary degenerative joint disease in both knees, with flexion contracture and fixed varus contracture. Dr. Balthrop's entry on December 19, 2018, indicated Gosper was "status-post bilateral total knee replacement and is functioning well." At that time, Dr. Balthrop placed Gosper on permanent light duty and recommended medical retirement, opining his osteoarthritis "is unlikely to be caused by his occupation which is very vigorous, but his occupation certainly impacted likely even worsen his arthritis."

6

Dr. Timothy Scott Prince performed an independent medical evaluation (IME) at the request of LFUCG on February 21, 2019. Gosper filed a copy of the medical report.

Dr. Prince's report began with a numerical chronological review of medical records. First, he referenced two incident reports. A report dated January 3, 2006, described a work-related right knee injury resulting from Gosper having been struck by a vehicle's spring-loaded side door. A report dated December 9, 2017, described a work-related slip and fall on ice, causing Gosper to strike his right knee on pavement.

Second, he referenced two MRI examinations of Gosper's right knee. An MRI dated April 27, 2006, demonstrated a tear of the posterior horn medial meniscus, with mild osteoarthritic changes in all three compartments, and small joint effusion with a popliteal cyst. An MRI dated May 9, 2013, demonstrated an extensive macerated tear involving most of the medial meniscus, with advanced osteoarthritic changes, and signal changes consistent with a chronic tear of the anterior cruciate ligament (ACL).

Third and finally, Dr. Prince summarized Dr. Balthrop's extensive medical records. On April 27, 2006, Dr. Balthrop recorded Gosper complained of minor right knee pain, with aching but no limitations, which he related to the having been struck by an ambulance door. Symptoms were increased with weightbearing and prolonged sitting. Following several office visits, including x-ray and MRI evaluation, Gosper was released on May 3, 2006, to return as needed. He returned on February 27, 2007, with recurrent right knee

7

complaints.  After additional MRI evaluation, Dr. Balthrop performed an arthroscopic partial meniscectomy and a patellar chondroplasty.  On June 26, 2007, Gosper reported "virtually no pain" and was returned to full duty.

Gosper returned six years later, complaining on May 8, 2013, of intermittent sharp pain, with difficulty bending, flexing or extending the right knee, and with grinding and popping sensations.  X-ray and MRI examinations revealed ten degrees of varus deformity and a significant amount of osteoarthritis with macerations of the medial meniscus.  On December 10, 2013, Gosper reported the onset of severe left knee pain.  Bilateral total knee replacement was considered but Dr. Balthrop elected to proceed with prescription medication and a series of four injections, after which Gosper reported his pain had "improved tremendously."

Gosper did not return until almost four years later, on December 13, 2017.  He complained of constant knee pain and symptoms, even with medication, and exacerbated with weightbearing activity.  X-ray examination now revealed a varus collapse of approximately seventeen degrees.  When additional injections failed to provide relief, Dr. Balthrop performed a right total knee arthroplasty on July 12, 2018, and a left total knee arthroplasty on August 23, 2018.  Dr. Balthrop noted Gosper was "functioning well with no discomfort" as of December 19, 2018, recommended he limit himself to "permanent light duty," and "told him the osteoarthritis is unlikely to be caused by his occupation, which is very vigorous, but his occupation certainly impacted and likely even worsened his arthritis."

Dr. Prince's report next summarized the medical history obtained from Gosper, himself. Gosper reported he had been a firefighter and an EMT since 2001 and had experienced no significant problems with his knee until around 2005 when he was struck by an ambulance door. Though the condition initially improved with conservative therapy, Gosper reported his pain and symptoms "never completely went away" and gradually worsened. He ultimately underwent a meniscectomy by Dr. Balthrop to repair a medial meniscus tear. He again noted initial improvement, but his intermittent pain and symptoms gradually increased, with the onset of left-sided problems by 2013, at which time he underwent a series of injections, which "helped significantly." However, a left hip injury in 2018 disclosed significant advancement of his bilateral knee conditions, particularly including "a significant leg length discrepancy," leading to bilateral total knee replacement surgeries. Thereafter, his condition and complaints improved dramatically following a course of physical therapy, though he remained functionally limited regarding "prolonged repetitive squatting or any crawling or kneeling" and was permanently restricted from engaging in "strenuous activities."

Dr. Prince's report next described Gosper's physical examination findings and his assessment of Gosper's current condition. Based on a review of Gosper's medical records, reported history, and physical examination, he diagnosed a May 2007 "right meniscal injury with prior right meniscectomy" and "osteoarthritis of both knees with significant varus deformity, status-post total knee replacement bilaterally."

9

Finally, Dr. Prince's report discussed several matters in response to LFUCG's request for a disability evaluation relative to its Policemen's and Firefighter's Retirement Fund. First, he opined "Gosper's varus deformity is the primary cause of his bilateral, progressive degenerative changes," while "[o]ther medical and physical conditions likely did contribute, including [b]eing overweight, which he described as "a significant risk factor for developing knee arthritis." However, though he opined "Gosper's disability is not due primarily to occupational causes," he acknowledged "work that is sustained, repetitive, and strenuous has been identified as a risk factor for arthritis" and "would have accelerated his degenerative changes," making it "reasonable to attribute a degree of aggravation to his work duties." Thus, Dr. Prince opined "[i]t is reasonable to attribute 75% of his left knee impairment and 50% of his right knee impairment to these non-occupational factors."

Second, Dr. Prince opined Gosper had reached maximum medical improvement (MMI). Third, based on "Tables 17-33 and 17-35" of "the 5th edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment" (Guides), he opined Gosper's whole person impairment (WPI) rating "is 15% based on a left total knee replacement and 15% based on the right total knee replacement," resulting in "an overall impairment of 28% of the whole person." Recalculated based on the foregoing apportionment of causation, he explained Gosper was left with "a 12% whole person impairment attributable to occupational factors." Fourth and finally, Dr. Prince's report stated Gosper "is totally unlikely to be permanently disabled" relative to his

10

duties as a firefighter, yet he opined Gosper "is not able to kneel or crawl" and "should not do strenuous activities involving squatting or climbing, particularly on ladders," all of which "would preclude him doing many emergency response functions."

Dr. Prince was thereafter deposed by LFUCG on September 9, 2019. His testimony was consistent with opinions expressed in his evaluative report.

On direct examination, Dr. Prince described Gosper's varus deformity as a condition in which the "knee is not straight and it bends outward a little bit so it puts more pressure on the medial part of the knee." He explained such varus deformities predispose individuals to certain types of knee conditions due to "wear and tear," most often resulting in arthritis. As such, he characterized Gosper's right knee osteoarthritis as "a progressive condition" which had worsened over time, intermittently requiring joint lubricating injections and pain-relieving medications related to episodic exacerbations.

Dr. Prince reaffirmed his assessment of a 12% whole body impairment, resulting from an adjustment reflecting non-occupational causation factors. However, he admitted "without the work-related component" Gosper would likely not have required the knee replacement surgery "at the age he had it." He also explained Gosper's post-surgical restrictions relating to physical activities were medically necessary because his knee joints were no longer "as strong and capable as [they had been] for very strenuous activities" and due to the need for "just trying to minimize wear and tear on the replaced joint."

11

On cross examination, Dr. Prince agreed Gosper's typical activities as a firefighter and paramedic qualified as heavy-duty work under the Labor Department's job classifications. He also opined the repetitive and strenuous kneeling, squatting, bending, climbing, lifting, and carrying work activities likely aggravated Gosper's pre-existing degenerative varus deformity and arthritic conditions into active impairment and disability as of December 2017, sooner than would have been the case had the work been less strenuous. In so opining, he testified the 2007 meniscal repair surgery had been successful, allowing Gosper to return to performing the full range of his heavy work duties, and Gosper's pre-existing degenerative conditions had remained dormant "so far as they affected his occupation" until December 2017. As of that date, he had recommended to the LFUCG Policemen's and Firefighter's Retirement Fund that Gosper be placed on disability retirement.

On redirect, when asked whether medications, injections, and other treatments received prior to December 2017 suggested an active condition "in a medical sense," Dr. Prince answered in the affirmative. However, upon follow-up, he qualified his response, testifying Gosper:

> . . . indicated – and the notes seemed to indicate, that he had some intermittent soreness and problems. He responded actually very well to the shots on occasion where he claimed – you know, was essentially symptom free. He always had some physical findings suggested, you know, the deformity itself, that were not normal from a standpoint of – you know, matches unaffected persons, but – and he also had crepitus. But he actually did fairly well intermittently with the treatment to the point that he would go off treatment for short – you know, go off his oral medications on occasion, especially early. Again, I don't know how much he did that later on.

12

Dr. Frank A. Burke performed an independent medical evaluation (IME) on May 30, 2019, at Gosper's request. Gosper thereafter filed Dr. Burke's IME report.

In preparing his IME report, Dr. Burke reviewed medical records of UK Healthcare and Dr. Prince, particularly referencing his review of the "timeline of medical records" dating back to January 3, 2006, which Dr. Prince's IME report correctly summarized. In addition, he reviewed medical records of Bluegrass Orthopaedics and Dr. Balthrop, citing Dr. Balthrop's repeated medical histories, physical examinations, conservative treatments, and releases for Gosper's return to work without restrictions, and particularly referencing operative reports dated July 12, 2018, and August 23, 2018, relating to Gosper's bilateral total knee replacements.

Regarding Gosper's medical history, Dr. Burke recorded Gosper generally "did well" until he suffered a torn medial meniscus in the right knee and became functionally compromised after twisting and falling "on ice while working" in December 2017. Though recording the incorrect incident date, Dr. Burke correctly noted Gosper had worked "with continued symptoms until taken to the operating room for a partial medial meniscectomy of the right knee." Similarly, though incorrectly listing the surgery date as May 21, 2017, Dr. Burke noted Gosper had improved postoperatively and "returned to full duty as a firefighter."

Dr. Burke's IME report correctly noted Gosper had been seen by Dr. Balthrop for episodic knee complaints related to "several minor work injuries"

13

prior to the more serious meniscus tear and meniscectomy. In this regard, he referenced Dr. Balthrop's "repeated" prior medical histories, physical examinations, and conservative treatments, all of which had resulted in significant improvement with Gosper being "released to work without restrictions each time."

Picking up his medical history summary after the right knee meniscectomy, Dr. Burke recorded Gosper had

> . . . . continued working, with required use of firefighting equipment episodically weighing 50-80 pounds during the work day and in training, with the frequent need to generate greater than 100 pounds of force carrying hose while fighting fires. While working standing, running and pulling hose, the patient repeatedly had an increase in knee pain and swelling bilaterally, right greater than left.

Over time, Dr. Burke noted Gosper had experienced the "return of right knee pain with the new onset of left knee pain, in part from over usage and limping secondary to right knee pain during working duties," with pain, swelling, and associated "decreased range of motion of his knees, especially on the right."

As a result of ongoing "falls with sprains of both knees" following the meniscectomy, Dr. Burke noted Gosper had again reported back to Dr. Balthrop on repeated occasions for reevaluation, which ultimately revealed bilateral narrowing of the medial joint space, with symptoms more pronounced on the right. Dr. Burke recorded Dr. Balthrop had performed a series of bilateral knee injections during this post-meniscectomy period, which had "provided significant help symptomatically for nearly four years."

During the four-year, post-meniscectomy period during which Dr. Balthrop provided injection therapy, Dr. Burke noted Gosper "continued to try

14

to work despite" experiencing "ache[s] in his knees with any type of weight." By the end of 2017, however, he noted Gosper "once again began to deteriorate in function with his regular duty activities."

After Gosper returned to Dr. Balthrop in late 2017 with increased bilateral knee complaints, but before additional injection therapies could be performed, Dr. Burke noted Gosper suffered yet another work-related fall involving "a loading twisting injury to both knees" in February 2018. This most recent incident in what Dr. Burke characterized as Gosper's series of "working falls with sprains" resulted not only in "significant pain and swelling in the knees, but also strain of the left hip flexor muscles at the hip." It was noted Dr. Balthrop ordered an immediate course of physical therapy for the hip strain and thereafter performed bilateral total knee arthroplasty procedures in July and August of 2018.

Following completion of a postoperative "aggressive rehabilitation program," Dr. Burke recorded Gosper's current symptoms included ongoing mild bilateral knee pain and persistent numbness and tingling adjacent to the incision lines. Though capable of walking, using stairs, and squatting, Gosper reported ongoing patellar tendon aches. Medically advised functional restrictions included avoidance of running, jumping, and other impactful activities.

Dr. Burke's physical examination of Gosper objectively confirmed "decreased sensation to light touch in the anterior aspects of both knees lateral to the total knee incisions." Moderate front to back instability bilaterally at 90

15

degrees of flexion, slight tenderness in the lower patellar tendon and along the medial joint line, and moderate atrophy of the thighs and lower extremities, greater on the left, were also noted.

Based on the foregoing, Dr. Burke diagnosed:

[T]he progressive development of osteoarthritis of both knees contributed significantly by work-related injuries, well documented on the right knee, but both knees involved over an extensive career of firefighting.

In support, Dr. Burke noted Gosper's work activities "frequently required wearing 50-80 pounds of firefighting equipment" along with "applying over 100 pounds of additional force pulling hose and other functions as a firefighter." Dr. Burke opined "[t]he treatment rendered has been reasonable and medically necessary for relief of [Gosper's] signs and symptoms," and concluded Gosper had reached MMI.

Addressing causation more specifically, Dr. Burke opined:

The nature and the duration of the work contributed to the development of progressive knee osteoarthritis. This resulted in total bilateral total knee arthroplasties. The application of additional and chronic force to the knees through usage and the physical activities of his work accelerated the progression of the arthritis.

More to the point, he opined:

This patient had a contributory work injury history with the need for an arthroscopy and partial medial meniscectomy, following a work injury with a slip and fall. This injury probably damaged the cartilage in his right knee. Both knees, however sustained multiple injuries in the form of slips, falls, blows, and repeated injuries as a firefighter. Although he had ongoing osteoarthritis before 12/17 he was always able to return fully to regular duty, he had an aggravation of this osteoarthritis because of his work usage and cumulative/repetitive trauma from this point.

Regarding impairment, Dr. Burke opined:

16

Utilizing the AMA's *Guides to the Evaluation of Permanent Impairment,* Fifth Edition and Table 17-35 on Page 549, this patient has a score of 76 points for the right knee and 71 points for the left knee, which results in a fair result bilaterally. This patient is, therefore, awarded 20% whole person impairment for the right knee and 20% impairment for the left knee. These values are combined and result in 36% total whole person impairment.

Dr. Burke opined Gosper is permanently precluded from returning to his former employment. He advised Gosper should avoid "running, side-to-side impact activities, repetitive squatting, or torquing activities on the knees," and noted a return to work as a firefighter would expose Gosper to ongoing repetitious "walking, standing, squatting, stooping, climbing, bending, lifting, carrying, stair climbing and twisting activities." Dr. Burke opined "these kinds of impact loading activities" would impose daily "stresses to his lower extremities" which would "continue to aggravate" his bilateral degenerative arthritic knee conditions and accelerate "the progression of cumulative damage."

Dr. J. Rick Lyon performed an IME on September 24, 2019, at the request of LFUCG. LFUCG thereafter filed Dr. Lyon's IME report.

In preparing his IME report, Dr. Lyon reviewed Gosper's April 15, 2019, Application for Resolution of Claim and his August 5, 2019, deposition transcript. Further, he provided a chronological summary of medical records from Gosper's primary care provider, Family Practice Associates, and treating orthopedic surgeon, Dr. Balthrop, dating back to May 14, 2013. In addition, he reviewed Dr. French's IME report, which included a similar chronology of medical records and incident reports dating back to April 27, 2006.

17

In particular, Dr. Lyon set out in full Dr. Balthrop's December 13, 2017, office note, which stated:

> Seen by Balthrop. *First seen a decade ago for arthritic symptoms in knees.* At that time, demonstrated mild but already had 5-6 degrees varus deformity of knees. Was seen in 2013 for arthritic symptoms and varus collapse and worsened. Measured at that time at 13 degrees. Was treated with Flexeril, hyaluronic. This provided him with surprisingly good relief. *Over last several years, arthritis has worsened.* Now has increasing pain with weight bearing activity. Also notices his knees are more bowed, and ROM is limited to about 90 degrees bilaterally. On exam, extreme varus gait. No instability. Full extends knees. Flexes to 90 degrees. Varus measured over 15 degrees. X-rays show increased varus collapse to approx. 17 degrees. Arthritis more severe medially, consistent with angulatory deformity. Surprised he's still functioning this well. Does not have enough problems to consider TKA [total knee arthroplasty]. Plan: repeat hyaluronic injection. With this level of deformity, less predictable but he still wants to proceed.

(Emphasis added).  In addition, he also set out in full Dr. Balthrop's December 19, 2018, office note, which stated:

> Seen by Balthrop. Reassessment of knees post bilateral TKA. Functioning well. In circumstances of firefighter, his inability to function at 100% could be dangerous for him or others. Therefore, permanent light duty or medical retirement. *Problems with the knees date back over 10 years. "I told him the osteoarthritis is unlikely to be caused by his occupation which is very vigorous, but his occupation certainly impacted likely even worsen (sic) his arthritis."* Work excuse for permanent light-duty status. 115 degrees bilaterally. Functioning well. Recheck 6 months.

(Emphasis added).

Dr. Lyon proceeded to record his own summary of Gosper's medical history.  He noted Gosper was fifty-four years of age, a high-school graduate, a firefighter who had "[w]orked for 16.5 years" at LFUCG, "has always been bowlegged, and was initially evaluated "by Dr. Balthrop after a work injury in approximately 2007 resulting in a meniscus tear" and a right medial

18

meniscectomy.[2]  Dr. Lyon recorded Gosper thereafter underwent long-term

bilateral injection treatments prior to sustaining a 2018 hip injury, and

"experienced significant issues with the knees, limiting his participation in

physical therapy" for which Dr. Balthrop had performed bilateral total knee

arthroplasty on July 12, 2018, and August 23, 2018.  Dr. Lyon recorded

Gosper had done "very well" postoperatively, with some "unusual 'sensation' in

the knees" but no limitations, and was "working approximately 25 hours a

week as a porter at a car dealership."

Based on the foregoing, Dr. Lyon diagnosed "[b]ilateral knee

osteoarthritis post bilateral knee arthroplasties."  Regarding causation, he cited

Gosper's "chronic history of genu varus or bowleggedness" which he described

as a "congenital/developmental deformity" resulting "in increased stresses

across the medial aspect of the knees and is a significant risk factor for the

development of arthritis."  He also cited Gosper's 2007 right knee injury and

right medial meniscectomy by Dr. Balthrop, stating "a prior meniscectomy also

significantly increases the risk of arthritis."  He agreed with Dr. Balthrop's

opinion "that the osteoarthritis is unlikely to have been caused by his

occupation," but disagreed "that the occupation impacted or worsened his left

knee arthritis."  From the foregoing, he concluded "no portion of the left knee

---

[2] Dr. Lyon was either unaware or overlooked that Gosper was actually initially evaluated by Dr. Balthrop earlier, on April 27, 2006, complaining of minor right knee pain and achiness, made worse with weightbearing or prolonged sitting, but without functional limitations, resulting from having been struck at work by an ambulance door.  As documented by Dr. French's IME report, conservative treatment provided relief and Dr. Balthrop released Gosper on May, 3, 2006, to return as needed.

19

osteoarthritis is a result of his work, but 50 percent of the right knee osteoarthritis is a result of the prior meniscectomy and subsequent traumatic arthritis."

Regarding Gosper's WBI, Dr. Lyon assigned ratings consistent with those derived by Dr. Prince. In particular, he opined:

> . . . . Gosper reached maximum medical improvement on 12/19/2018 following bilateral knee arthroplasties. Since he is at MMI, an impairment rating can be determined using the AMA Guides to Impairment, 5th edition.

For Gosper's right knee, Dr. Lyon opined

> . . . . per Table 17-35, p. 549, he receives 50 points for pain, 24 points for range of motion and 25 points for stability. He receives a no deduction for the flexion contracture, resulting in 99 points for the right knee. Per Table 17-33, p. 546, the points convert to a 15 percent whole person impairment

For the left knee, he opined Gosper

> . . . . receives 50 points for pain, 22 points for range of motion and 25 points for stability. He receives a 2-point deduction for loss of extension, resulting in 95 points. Per Table 17-33, p. 546, the points convert to a 15 percent whole person impairment.

Because he attributed only 50% of Gosper's right knee condition to occupational factors, Dr. Lyon assigned "an 8 percent whole person impairment as a result of work."

Regarding permanent restrictions, Dr. Lyon opined "Gosper is capable of returning to a sedentary job but not to his pre-injury job." Because Gosper was incapable of returning to the full range of physical activities demanded of a firefighter, Dr. Lyon agreed with Dr. Balthrop's assessment that returning to his former employment would be dangerous "for him or others."

20

Following the final hearing, the ALJ determined Gosper's cumulative trauma injury was work-related. The ALJ also concluded Gosper suffered permanent partial disability and awarded him $835.04 per week for 425 weeks. The ALJ further awarded Gosper "medical expenses including but not limited to provider fees, hospital treatment surgical care nursing supplies and appliances as may be reasonably required for the cure and relief from the effects of the work-related injury." LFUCG filed a petition for reconsideration, which the ALJ denied. The Board unanimously affirmed the decision of the ALJ. The Court of Appeals affirmed the decision of the Board. This appeal followed.

## II. STANDARD OF REVIEW

As a creature of statute, workers' compensation proceedings are administrative in nature, rather than judicial. *Whitaker v. Reeder*, 30 S.W.3d 138, 143 (Ky. 2000). Under KRS 342.275, the ALJ is "empowered to function the same as a trial court trying a case without a jury." *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687 (Ky. 1992). This Court has long recognized "the claimant bears the burden of proof and the risk of nonpersuasion before the fact-finder with regard to every element of a workers' compensation claim." *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 96 (Ky. 2000). Substantial evidence is required to sustain that burden on each element of the claim. *Id.* Substantial evidence is "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable [persons]." *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971). The ALJ as "the finder of

21

fact . . . has the authority to determine the quality, character and substance of the evidence presented." *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985). "Moreover, an ALJ has sole discretion to decide whom and what to believe, and may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof." *Bowerman v. Black Equip. Co.*, 297 S.W.3d 858, 866 (Ky. App. 2009).

Appeal from an ALJ's decision on a workers' compensation claim is a matter of legislative grace as opposed to a matter of right. *B.L. Radden & Sons, Inc. v. Copley*, 891 S.W.2d 84, 86 (Ky. App. 1995). The appellate process is governed by statute. *W. Baptist*, 827 S.W.2d at 686. The Board performs the first level of review under KRS 342.285. KRS 342.285(2) defines the scope of the Board's review:

> The board shall not substitute its judgment for that of the administrative law judge as to the weight of evidence on questions of fact, its review being limited to determining whether or not:
>
> (a) The administrative law judge acted without or in excess of his powers;
>
> (b) The order, decision, or award was procured by fraud;
>
> (c) The order, decision, or award is not in conformity to the provisions of this chapter;
>
> (d) The order, decision, or award is clearly erroneous on the basis of the reliable, probative, and material evidence contained in the whole record; or
>
> (e) The order, decision, or award is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

The purpose of the Board's review is error correction, though without the power of constitutional review. *W. Baptist*, 827 S.W.2d at 687.

KRS 342.290 subjects the Board's decision to judicial review by the Court of Appeals as provided by "Section 111 of the Kentucky Constitution and rules adopted by the Supreme Court." The Court of Appeals' review "shall include all matters subject to review by the board and also errors of law arising before the board and made reviewable by the rules of the Supreme Court for review of decisions of an administrative agency." The Board should not be corrected "unless the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *W. Baptist*, 827 S.W.2d at 687-88. An appellate court reviews questions of law and the application of law to facts under the de novo standard. *Bowerman*, 297 S.W.3d at 866. But as to questions of fact, the standard of review is whether the finding was "clearly erroneous," meaning "unreasonable under the evidence presented." *Letcher Cnty. Bd. of Educ. v. Hall*, 576 S.W.3d 123, 126 (Ky. 2019).

When the sufficiency of evidence is contested on appeal, the test for whether the ALJ's decision is clearly erroneous depends on whether the decision favors the party with the burden of proof or goes against the party with the burden of proof. *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986). We explained the differing tests as follows:

> When the decision of the fact-finder favors the person with the burden of proof, his only burden on appeal is to show that there was some evidence

of substance to support the finding, meaning evidence which would permit a fact-finder to reasonably find as it did.

If the fact-finder finds against the person with the burden of proof, his burden on appeal is infinitely greater. It is of no avail in such a case to show that there was some evidence of substance which would have justified a finding in his favor. He must show that the evidence was such that the finding against him was unreasonable because the finding cannot be labeled "clearly erroneous" if it reasonably could have been made.

*Id.* Logically, a factual finding may not be deemed "clearly erroneous" if supported by substantial evidence of record—that is, substantial evidence compels affirmation. *Whittaker v. Rowland*, 998 S.W.2d 479, 481-82 (Ky. 1999). "In short, appellate courts may not second-guess or disturb discretionary decisions of an ALJ unless those decisions amount to an abuse of discretion." *Bowerman*, 297 S.W.3d at 866.

Final decisions of the Court of Appeals in a workers' compensation proceeding may be appealed to this Court as a matter of right under Section 115 of the Kentucky Constitution. *Vessels ex rel. Vessels v. Brown-Forman Distillers Corp.*, 793 S.W.2d 795, 798 (Ky. 1990). RAP[3] 49(K) specifies further review in this Court "shall be prosecuted in accordance with the rules generally applicable to other appeals pursuant to RAP 30, 31, 32 and 60." While the right of appeal to this Court is constitutionally mandated, the scope of our review is generally limited to the determination of "new or novel questions of statutory construction, or to reconsider precedent when such appears necessary, or to review a question of constitutional magnitude." *W. Baptist*,

---

[3] Kentucky Rules of Appellate Procedure.

24

827 S.W.2d at 688. As such, this Court will not simply "third guess" the decisions of the Board and the Court of Appeals upon the same evidence. *Id.*

## III. ANALYSIS

LFUCG asserts "egregious errors" by the ALJ "were not adequately addressed" by the Board or the Court of Appeals. In particular, it argues the Board should have remanded the case to the ALJ for entry of more specific findings of fact to support legal conclusions regarding causation, impairment, and conformity with the Guides. It alleges the ALJ abused discretion in weighing evidence by failing to set forth sufficient findings of fact identifying portions of the record relied upon in reaching these conclusions or reconsideration of those decisions. We disagree.

### A. EVIDENCE SUPPORTED FINDNG OF INJURY AND CAUSATION

For its first contention of error, LFUCG argues the ALJ erred in finding Gosper had sustained an "injury" as defined under KRS 342.0011(1). Particularly, it asserts Gosper failed to carry his burden of proof and risk of non-persuasion to establish work-related cumulative trauma as the "proximate cause" of the permanent harmful change in his human organism, noting "injury" does not include the effects of the natural aging process.

It has long been recognized that injuries resulting from cumulative trauma, or gradual wear and tear, are compensable. *Haycraft v. Corhart Refractories Co.,* 544 S.W.2d 222, 225 (Ky. 1976). However, LFUCG argues the statutory definition of "injury" was broader when *Haycraft* was decided in 1976. In that landmark decision, our Court recognized "the rigors of strenuous

25

manual labor [are] bound to hasten toward its breaking point the debilitating process of a degenerative" condition. *Id.* While acknowledging arthritic changes are often "part of the normal aging process"—also referred to as normal wear and tear—"which is common to the general public regardless of one's individual occupation," our Court held:

> [I]f it be found, or should be found, that the nature and duration of the work probably aggravated a degenerative disc condition to the degree that it culminated in an active physical impairment sooner than would have been the case had the work been less strenuous, to that extent the pre-existing condition is itself an injury as now defined in KRS 342.620(1), . . .

*Id.*

As LFUCG notes, when enacted in 1972, KRS 342.620(1) defined "injury" broadly to mean "any work related harmful change in the human organism," and caselaw applying the definition focused on such matters as "aggravation" and "acceleration," to which we would add, "arousal." Conversely, LFUCG notes the current statutory definition of "injury," as adopted in 1980, is found at KRS 342.0011(1) and is much less inclusive. Still excluding "the effects of the natural aging process" from the term's definition, LFUCG points out the current statute defines "injury" as:

> [A]ny work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause producing a harmful change in the human organism evidenced by objective medical findings.

KRS 342.0011(1). However, to the extent LFUCG invites this Court to adopt its asserted semantic distinctions to retreat from the long-established precedent announced in *Haycraft*, we decline.

26

LFUCG argues no cumulative trauma "injury" can be compensable under the statute absent a finding that the "work-related traumatic event or series of traumatic events" were the "proximate cause" of the harmful organic change, based on "objective medical findings." Based on the current statutory definition, LFUCG argues *Haycraft* "remains instructive," but otherwise "should be viewed with a degree of caution." When harmonized with the preclusion of any award of disability income benefits for non-work-related conditions found in KRS 342.730(1)(e), LFUCG argues the current definition limits *Haycraft's* ongoing applicability to merely require entry of findings of fact by ALJs detailing "how much the work contributed" to a claimant's disability.

Moreover, LFUCG proceeds to argue cumulative trauma claims should not serve as an unwarranted substitute for pursuing claims based on "specific injurious events." In the present case, LFUCG asserts the record includes substantial evidence of "specific dates of injury" rather than a cumulative trauma injury, and that the ALJ failed his function as "gatekeeper" to force Gosper to conform his proof to his claim, as filed. In essence, LFUCG claims the ALJ erred in failing to enter findings of fact sufficient to establish the "series of traumatic events" arising from Gosper's lengthy and strenuous activities as a firefighter and EMT were the "proximate cause," in whole or part, of the gradual, but significant, deterioration of his congenital or longstanding bilateral degenerative arthritic knee conditions which ultimately required surgical intervention and resulted in both physical impairment and occupational disability.

27

In support of its arguments, and borrowing from *Black's Law Dictionary*, LFUCG defines "proximate cause" as being any origin which, in its "natural and continuous sequence, unbroken by any efficient intervening cause, produces injury, and without which the result would not have occurred." LFUCG would distinguish "proximate cause" from a mere "aggravation" and "acceleration," which it argues do not rise to the level of an etiology or cause. Citing the *Merriam Webster Dictionary*, LFUCG defines "aggravation" as a mere "act or circumstance that intensifies something or makes something worse," and "acceleration" as "the act or process of moving faster or happening more quickly." We would note the same general reference lexicon defines "arousal" as an awakening, rousing, or stimulation from a dormant to an active awareness or condition.

We hold the statutory distinctions urged by LFUCG to avoid the pronouncements established long ago in *Haycraft* are without substance, and the infirmity of its underlying semantic argument is revealed when more scholarly medical definitions are referenced. In particular, *Stedman's Medical Dictionary* defines "cause" as "that—meaning an internal or external circumstance or occurrence—which produces an effect or condition." The medical reference distinguishes between predisposing, precipitating, and proximate causes. *Id.* A "predisposing" cause is defined as "anything that produces a susceptibility or disposition to a condition without actually eliciting it." *Id.* A "precipitating" cause is defined as "a factor that initiates the onset of manifestations of a disease process." *Id.* And, a "proximate" cause is defined

28

as the "immediate" cause which "precipitates a condition." *Id.* Echoing this precise medical understanding, the more generalized *Oxford English Dictionary*[4] includes reference to a possible "set of causes" in defining the "etiology" of a disease or condition, and the *Guides* reference "exposure to hazards" (plural) as "[a]n identifiable factor" related to "causation" of "a medically identifiable condition."

In a workers' compensation proceeding, work-related causation is a factual determination subject to the sound discretion of the ALJ, as the finder of fact. *Ford Motor Co. v. Jobe*, 544 S.W.3d 628, 633 (Ky. 2018) (citation omitted). When determination of causation demands medical understanding and analysis beyond mere lay knowledge and skill, "the question is one properly within the province of medical experts" and "disregarding the medical evidence" is not justified. *Mengel v. Hawaiian-Tropic Northwest and Central Distrib., Inc.*, 618 S.W.2d 184, 187 (Ky. App. 1981). Medical opinions addressing causation need not be stated with absolute certainty or conclusiveness but are sufficient if expressed within "reasonable medical probability." *Lexington Cartage Co. v. Williams*, 407 S.W.2d 395, 396 (Ky. 1966). The mere possibility of work-related causation is insufficient. *Terry v. Associated Stone Co.*, 334 S.W.2d 926, 928 (Ky. 1960). While KRS 342.0011(1) requires objective medical findings of *a harmful change* in the human organism to establish a compensable "injury," the statute does not limit proof of the

---

[4] *Etiology,* OED Online. March 2023. Oxford University Press.

29

*causation* of such an "injury" to objective medical findings. *Staples, Inc. v. Konvelski*, 56 S.W.3d 412, 415-16 (Ky. 2001).

In the present case, the ALJ found a generalized consensus of medical opinions regarding causation among Drs. Balthrop, Prince, and Burke, and, citing *Haycraft*, concluded:

> These credible objective medical opinions have convinced the ALJ . . . that the nature and duration of [Gosper's] work . . . aggravated a degenerative condition into an active physical impairment sooner than would have been the case had the work been less strenuous.

LFUCG argues the ALJ erred, asserting Drs. Balthrop and Prince believed Gosper's injury was not primarily caused by work-related activities, but more likely had resulted from the underlying arthritic conditions and varus deformity. However, our foregoing review of the medical evidence pertaining to the question of causation reveals all three physicians acknowledged Gosper's job duties significantly contributed to the acceleration or aggravation of his degenerative knee condition.

First, Dr. Balthrop advised Gosper on December 13, 2017, that his knee conditions were causally related to his work activities, leading Gosper to immediately notify his supervisor. Dr. Balthrop later testified it was "very likely" Gosper experienced significant stress on his joints due to the heavy physical demands of his job and the length of his career as a firefighter. He also testified the lengthy and "arduous nature of his work," in combination with Gosper's "physical makeup," particularly including his varus deformity, had "accelerated" his deterioration and ultimate need for knee joint replacement.

30

Second, though Dr. Prince opined Gosper's "varus deformity is the primary cause of his bilateral, progressive degenerative changes," he admitted work-related factors "would have accelerated his degenerative changes." He also admitted, "it is reasonable to attribute a degree of aggravation to his work duties." Dr. Prince further opined a varus deformity "predisposes an individual" to progressive arthritic degeneration over time, noted the work activities of a firefighter are intermittently strenuous, testified "he would not be having active symptoms at that point . . . certainly, without . . . contribution of his occupational stressors," and admitted any preexisting degenerative changes were occupationally dormant prior to the December 2017 debilitating onset.

And third, Dr. Burke opined Gosper had sustained progressive development of osteoarthritis in both knees "contributed to significantly by work-related injuries, well documented on the right knee, but both knees involved over an extensive career of firefighting." After describing the heavy strenuous nature of Gosper's work activities, Dr. Burke opined the nature and the duration of the work contributed to and accelerated the progression of Gosper's development of progressive knee osteoarthritis, which ultimately necessitated the bilateral total knee arthroplasties.

The foregoing harmonious chorus of medical opinions irrefutably establishes "there was some evidence of substance to support" the ALJ's factual finding of a work-related cumulative trauma injury, and any suggestion the trier's conclusions were unreasonable is discordant with the weight of evidence and falls flat. *Francis*, 708 S.W.2d at 643. The ALJ's factual

31

determinations were "supported by 'substantial evidence of probative value'" and reversal is unwarranted. *French v. Rev-A-Shelf*, 641 S.W.3d 172, 178 (Ky. 2022) (citing *Wilkerson v. Kimball Int'l, Inc.*, 585 S.W.3d 231, 236 (Ky. 2019)). Gosper clearly met his burden of proof and bore the risk of non-persuasion regarding the essential elements of his cumulative trauma claim. *Snawder v. Stice*, 576 S.W.2d 276, 279 (Ky. App. 1979) (citations omitted).

Dr. Lyon's contrary opinions supported but did not compel a different decision. *Abel Verdon Const. v. Rivera*, 348 S.W.3d 749, 754 (Ky. 2011). Though medical evidence was conflicting, "the question of which evidence to believe is the exclusive province of the ALJ." *Square D Co.*, 862 S.W.2d 308, 309 (Ky. 1993). As finder of fact, an ALJ has sole discretion to determine the quality, weight, character, credibility, and substance of the evidence, together with the inferences to be drawn therefrom. *AK Steel Corp. v. Adkins*, 253 S.W.3d 59, 64 (Ky. 2008); *Square D*, 862 S.W.2d at 309; and *Paramount Foods*, 695 S.W.2d at 419. In doing so, an ALJ "may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same party's total proof." *Abel Verdon Const.*, 348 S.W.3d at 753-54.

From the foregoing overview of the conflicting evidence, it is clear the ALJ's finding that the precipitating "rigors" of Gosper's strenuous and lengthy heavy manual labor as a firefighter and EMT hastened the deterioration and worsened the debilitating symptoms of his predisposing degenerative osteoarthritis and varus deformity, and represented the "proximate cause" of

32

his current post-surgical physical condition, functional impairment, and occupational limitations, was supported by substantial evidence. *Haycraft*, 544 S.W.2d at 225. To borrow from LFUCG's referenced definition of "proximate cause," it was, in fact, the very "efficient intervening cause" of Gosper's precipitating occupational rigors that broke the "natural and continuous sequence" of the underlying predisposing degenerative osteoarthritis and varus deformity, accelerating and exacerbating those stagnant and dormant physical conditions into active and disabling symptomatic reality. There was no error.

## B. SUBSTANTIAL EVIDENCE SUPPORTED FINDING OF CAUSATION

LFUCG's second argument is related to the first, and asserts the ALJ erred in placing any reliance, whatsoever, upon the medical opinions of Dr. Burke regarding diagnosis, causation, impairment rating, or permanent restriction due to their having been based on a substantially inaccurate and largely incomplete medical history. We disagree.

In reaching his various findings and conclusions, the ALJ found Gosper's testimony "exceptionally credible" and had placed "significant weight" upon his representations regarding "the repetitive nature of his job duties" performed over a period of nineteen years and the "gradual and progressive deterioration of his knee joints." As to causation, the ALJ found "the consensus of opinion" expressed by Drs. Balthrop, Burke, and Prince persuasive. More particularly, the ALJ found Dr. Balthrop had diagnosed Gosper with "osteoarthritis, which had worsened due to repetitive activity from work," opining that his

33

"occupation over 19 years had accelerated his degenerative changes in excess of what would otherwise be expected." He further found Dr. Prince had opined that Gosper's "pre-existing degenerative changes were dormant until December of 2017" and "without the work-related components," Gosper "likely would not have needed knee replacement at his age." Finally, he found Dr. Burke had similarly diagnosed "an aggravation of osteoarthritis due to cumulative and repetitive trauma from work." Based on these three congruous medical opinions, the ALJ proceeded to enter his finding that "the nature and duration of the Plaintiff's work with the Defendant aggravated a degenerative condition into an active physical impairment sooner than would have been the case had the work been less strenuous."

In assessing an impairment rating, the ALJ further indicated that he had been "most persuaded" by the opinion of Dr. Burke, largely because it was "most consistent with the credible testimony of the Plaintiff," in addition to being "based squarely upon the objective medical evidence." The ALJ proceeded to find that "Dr. Burke credibly assessed a 20% impairment for the right knee and a 20% impairment for the left knee resulting in a 36% total whole person impairment" pursuant to Table 17-35 on page 549 of the Guides. Finding the impairment ratings expressed by Dr. Burke fell "within the range cited therein," the ALJ concluded "the opinion of Dr. Burke was rendered in accordance with the AMA Guides, that the Plaintiff sustained a 36% whole person impairment, and that the mechanism of injury was cumulative trauma."

In awarding permanent partial disability income benefits based on the "3" multiplier set forth in KRS 342.730(1)(c)1, the ALJ found Gosper "does not retain the physical capacity to return to the same type of work" previously performed.  Again, he based his finding on the consonant medical opinions of Dr. Balthrop, who "determined that the Plaintiff could no longer work as a fireman, Dr. Prince, who found "that the Plaintiff would be unable to continue working as a fireman," and Dr. Burke, who "issued restrictions requiring the avoidance of running, side to side impact activities, and repetitive squatting, or torqueing activities with the knees."

In asserting the ALJ erred in placing any weight upon medical opinions expressed by Dr. Burke, and arguing that any determinations based upon them, whatsoever, should be set aside, LFUCG points to certain misstatements Dr. Burke recorded in his report concerning Gosper's medical history which it argues undermines the reliability of his various conclusions to the extent his opinions cannot constitute substantial evidence.  LFUCG cites *Cepero v. Fabricated Metals Corp.*, 132 S.W.3d 839, 842 (Ky. 2004), and *Osborne v. Pepsi-Cola*, 816 S.W.2d 643, 647 (Ky. 1991), *superseded by statute on other grounds as stated in Smith v. Dixie Fuel Co.*, 900 S.W.2d 609 (Ky. 1995)), in support of its contention.

In *Cepero*, the claimant sustained a work-related knee injury.  132 S.W.3d at 840.  One week later, the claimant sought medical treatment from Dr. Louise Box and informed her that he had previously injured his knee while practicing martial arts and had been confined to a wheelchair for three

35

months.  *Id.*  The claimant did not mention his recent work-related injury.  *Id.*

Dr. Box referred the claimant to orthopedic surgeons, Drs. Leonard Goddy and

Thomas Loeb.  *Id.*

Dr. Goddy treated the claimant approximately three weeks after the

work-related injury.  *Id.*  The claimant again did not mention his work-related

injury, but told Dr. Goddy about the martial arts injury.  *Id.*  Dr. Loeb

subsequently performed surgery upon the claimant's knee.  *Id.*  A second

surgery was later performed, after which the claimant's knee condition

worsened.  *Id.*  Dr. Loeb attributed the cause of the claimant's injuries to the

martial arts incident.  *Id.* at 840-41.

The claimant was later examined by Dr. David Changaris.  *Id.* at 841.

Dr. Changaris issued a report attributing the entirety of the claimant's present

condition to the work-related injury.  *Id.*  Notably, the report made no mention

of the martial injury the claimant had reported to Drs. Box and Goddy.  *Id.*

Dr. Ellen Ballard conducted an IME.  The claimant attributed the

entirety of condition to the work-related injury and specifically denied any prior

injuries.  *Id.*  Dr. Ballard concluded the work-related injury caused the

claimant's condition.  *Id.*  However, at her deposition, Dr. Ballard changed her

opinion when confronted with the medical records of Drs. Box and Goddy.  *Id.*

Dr. Ballard then stated she believed it was more likely than not that the martial

arts injury caused the claimant's condition.  *Id.*

Notably, Dr. Changaris's report only referred to Dr. Loeb's diagnosis and

treatment and did not contain the claimant's true medical history nor any

36

mention of the medical history obtained by Dr. Goddy. *Id.* at 843. Further, Dr. Changaris did not testify, thereby forestalling any clarification as to the basis of his opinions. *Id.* Moreover, Dr. Ballard testified Dr. Goddy's medical history had not been provided and she had only reviewed the treatment records of Dr. Loeb. *Id.*

The ALJ found the work-related incident caused the claimant's injury based on the opinion of Dr. Changaris and that of Dr. Ballard before she considered the reports of Drs. Box and Goddy. *Id.* at 842. The Board reversed, holding the finding of causation was not supported by substantial evidence. The Court of Appeals affirmed the Board. *Id.* On further review, this Court agreed the finding was not supported by substantial evidence. *Cepero*, 132 S.W.3d at 843.

We held Dr. Changaris's finding regarding causation had not been based on the claimant's "true medical history" because Dr. Changaris's opinion did not consider the prior martial arts injury, stating:

> In the absence of proof, we will not assume that any competent medical examiner would be aware of but fail to mention a history of a prior injury to the exact same part of the body for which compensation is sought, especially a prior injury that resulted in two months' confinement to a wheelchair and a recommendation of surgery. We assume, instead, that Dr. Changaris was unaware of that history.

*Id.* Specifically, *Cepero* may best be understood to establish that any opinion generated by a physician on the issue of causation cannot constitute substantial evidence where the physician's medical history pertaining to the claimant's injury is irrefutably corrupt due to it being substantially inaccurate

or largely incomplete. *Id.* More generally, however, *Cepero* decrees that no medical opinion can be reasonably probable when predicated upon erroneous or deficient information which is completely unsupported by any other credible evidence. *Id.*

Our decision in *Cepero* is distinguishable from the present appeal. Reading Dr. Burke's four-page IME report as a whole and in conjunction with his review of extensive medical records and IME reports, it is clear his medical opinions relating to diagnosis, causation, impairment, and permanent physical restrictions were neither irrefutably corrupt, substantially inaccurate, largely incomplete, nor completely unsupported by other credible evidence. Indeed, the ALJ actually found Dr. Burke's medical opinions to be consistent with those expressed by Dr. Balthrop and Dr. Prince, even if not in exact conformity with their views.

While otherwise correctly summarizing the lengthy chronology of Gosper's medical history, a fair reading of Dr. Burke's report discloses he inadvertently transposed Dr. Prince's citation to a December 19, 2017, incident report stating Gosper had struck his "right knee on pavement" when he fell "on ice while working" with Dr. Prince's other citation to a much earlier incident report, dated January 3, 2006, stating Gosper had sustained a bruised right knee when it was struck by a spring-loaded vehicular door. The correct chronology of these historical events was further disclosed to Dr. Burke in additional medical records he reviewed, including Dr. Balthrop's reference to Gosper's right-sided arthroscopic partial meniscectomy and patellar

38

chondroplasty having been performed on May 21, 2007, and Dr. Lyon's IME report referencing the occurrence of the meniscus tear and meniscectomy in 2007.

Further, Dr. Burke's entry indicating Gosper's knee conditions had deteriorated symptomatically in 2017, following four years of successful injection therapies, which had, themselves, been initiated after a period of improvement following the right knee meniscectomy, is indisputable evidence he adequately understood the overall chronology of Gosper's bilateral knee conditions despite his misfortunate misreporting of the earlier dates on which the meniscus tear and meniscectomy occurred.

Contrary to the situation in *Cepero*, there is no indication Dr. Burke's opinion was tainted by a complete failure to consider relevant medical events. Dr. Burke was cognizant of Gosper's prior injuries. Consequently, any inaccuracies in Dr. Burke's report impact the weight and credibility of his opinion, which are matters within the sole province of the ALJ as factfinder.

Our decision in *Osborne* is likewise distinguishable from the present appeal. In *Osborne*, the ALJ found the claimant's injury was not work-related and denied relief. On appeal, the claimant argued the physician's opinions expressed by his physician had been uncontradicted and compelled a finding in his favor. Even so, the physician's opinions were based solely on the claimant's own reported medical history. Ultimately, this Court held the ALJ was not required to accept the physicians' opinions when their veracity had

been called into question by other evidence. *Osborne*, 816 S.W.2d at 647. We explained:

> When a medical opinion is based solely upon history, the trier of fact is not constricted to a myopic view focusing only on the physicians' testimony. Other testimony bearing on the accuracy of the history may be considered. After all, funneling a statement through a second party provides no additional credibility enhancement. The recitation of a history by a physician does not render it unassailable. *If the history is sufficiently impeached, the trier of fact may disregard the opinions based on it.* . . . After all, the opinion does not rest on the doctor's own knowledge, an essential predicate to make uncontradicted testimony conclusive.

*Id.* (emphasis added).

Here, contrary to the situation in *Osborne*, there has been no assertion that the ALJ was *compelled* to accept Dr. Burke's opinion as conclusive. Instead, the ALJ found Gosper "exceptionally credible" and Gosper's recitation of his medical history remained consistent when reported to an array of physicians. Further, Dr. Burke's opinions were not based solely on Gosper's reported history but were also informed through his examination of Gosper and his review of extensive prior medical records which provided a forthright chronology of Gosper's ongoing cumulative work-related traumas, complaints, treatments, and physical capabilities.

Again, an ALJ possesses sole authority to weigh evidence and resolve conflicts. *Square D Co.*, 862 S.W.2d at 309. We agree with the Court of Appeals and the Board that the ALJ's reliance upon Dr. Burke's opinion—taken alone or in conjunction with the opinions of Drs. Balthrop and Prince—was supported by substantial evidence.

40

## C. FINDINGS OF FACT WERE SUFFICIENTLY SPECIFIC

For its third and final contention of error, LFUCG argues Gosper's claim should have been remanded to the ALJ to make more specific factual findings in support of his conclusions regarding causation, impairment and conformity with the *Guides*. We disagree.

As trier of fact, an ALJ is required "to translate the lay and medical evidence into a finding of occupational disability." *McNutt Constr./First Gen. Servs. v. Scott*, 40 S.W.3d 854, 860 (Ky. 2001). While an ALJ need not provide an exhaustive discussion of the evidence and analysis leading to a decision, KRS 342.275 and case law "require the fact-finder to support conclusions with facts drawn from the evidence" sufficient for the parties to be fairly "apprised of the basis for any decision" and to allow informed appellate review. *Big Sandy Community Action Program v. Chaffins*, 502 S.W.2d 526, 531 (Ky. 1973). To satisfy these requirements, an ALJ must issue "an opinion that summarizes the conflicting evidence concerning disputed facts; weighs that evidence to make findings of fact; and determines the legal significance of those findings." *Arnold v. Toyota Motor Mfg.*, 375 S.W.3d 56, 61-62 (Ky. 2012). Moreover, parties to a workers' compensation dispute are entitled to findings based on a correct understanding of the evidence of record, and where it is demonstrated the ALJ held an erroneous understanding of relevant evidence in reaching a decision, courts have authorized remand for further findings. *Whitaker v. Peabody Coal Co.*, 788 S.W.2d 269, 270 (Ky. 1990) (citing *Cook v. Paducah Recapping Co.*, 694 S.W.2d 684, 689 (Ky. 1985)).

41

Regarding causation, LFUCG argues the ALJ erred by finding a consensus of medical opinion, asserting Drs. Balthrop and Prince believed Gosper's injury was not primarily caused by work-related activities, but more likely was caused by the underlying arthritic conditions and varus deformity.

The ALJ adequately explained the evidentiary basis of its finding on causation. Paragraphs 17-21 detail the extent to which Drs. Balthrop, Burke, and Prince agreed Gosper's work-related duties caused his cumulative trauma injury. While LFUCG emphasizes the points on which the physicians did not agree, these disagreements merely amount to conflicting evidence. The ALJ's findings properly apprised the parties of the basis of its decision and otherwise allowed for meaningful appellate review. Moreover, we have heretofore rejected LFUCG's similar argument attacking the ALJ's finding of a compensable injury and work-related causation, and in doing so we have thoroughly summarized the extensive medical proof and outlined the ALJ's specific, concise, and reasonable factual findings relative to this issue. We discern no reason to disturb the ALJ's findings on this issue.

Regarding impairment, LFUCG similarly argues the ALJ's reliance on Dr. Burke's assignment of a 20% impairment rating for each of Gosper's knees for a total 36% whole person impairment was inconsistent with the objective medical evidence and Gosper's own testimony.

"[T]he proper interpretation of the Guides and the proper assessment of an impairment rating are medical questions[.]" *Kentucky River Enters, Inc. v. Elkins,* 107 S.W.3d 206, 210 (Ky. 2003). However, the ALJ has discretion to

choose the rating used as the basis for an award of permanent partial disability benefits. *Pella Corp. v. Bernstein*, 336 S.W.3d 451, 453 (Ky. 2011).

Again, the ALJ's findings adequately explained the basis of its decision. We have heretofore summarized the ALJ's specific, concise, and reasonable findings of fact relative to the issue of impairment under the Guides. The ALJ outlined its reliance on Dr. Burke's medical opinions relating to impairment as most credible vis-à-vis any conflicting views expressed by the other physicians. The ALJ further adequately specified its reliance on Gosper's testimony relative to that of Dr. Burke. As with any other type of evidence, where opinions from medical experts conflict regarding the appropriate percentage, it is the prerogative of the ALJ to weigh the evidence and select the rating upon which permanent disability benefits, if any, will be awarded. *Knott Cnty. Nursing Home v. Wallen*, 74 S.W.3d 706, 710 (Ky. 2002).

Finally, regarding the conformity of Dr. Burke's impairment rating to the Guides, LFUCG argues there is insufficient evidence to indicate how he determined the total assigned rating for each knee. As with its findings on causation and impairment, the ALJ's findings on this issue were sufficient. Paragraph 24 set forth the basis of Dr. Burke's calculation rating. The ALJ further noted the evidence was conflicting. However, Dr. Burke was not cross-examined on the question of whether his impairment rating was assessed in conformity with the Guides. No other physician offered any evidence opining Dr. Burke's assessment was not in conformity with the Guides. We have not been cited to any authority requiring factual findings to evince the precision

43

and specificity urged by LFUCG. Therefore, we conclude the ALJ's findings were sufficient under our precedents.

## IV. CONCLUSION

Having reviewed the opinions below, the evidence of record, and LFUCG's arguments, we are convinced the ALJ's findings were supported by substantial evidence and should not be disturbed. We further conclude the award of the ALJ and the decisions of the Board and Court of Appeals upon review were neither patently unreasonable nor flagrantly implausible, and we are not persuaded that any controlling statute or precedent was overlooked, misapplied, or misconstrued.

Accordingly, the decision of the Court of Appeals is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT, LEXINGTON FAYETTE URBAN COUNTY GOVERNMENT:

Thomas L. Ferreri
Lori V. Daniel
Ferreri Partners, PLLC


COUNSEL FOR APPELLEE, MICHAEL GOSPER:

Donald R. Todd
Todd & Todd PLLC


ADMINISTRATIVE LAW JUDGE:

Hon. Jonathan R. Weatherby, Jr.


WORKERS' COMPENSATION BOARD:

Hon. Michael Wayne Alvey
Chairman, Department of Workers' Claims